**Hearing Date and Time: November 16, 2021 at 10:00 a.m. (prevailing Eastern Time)**
**Reply Deadline: November 9, 2021 at 4:00 p.m. (prevailing Eastern Time)**

Elisha D. Graff
Kathrine A. McLendon
David R. Zylberberg
Jamie J. Fell
**SIMPSON THACHER & BARTLETT LLP**
425 Lexington Avenue
New York, NY 10017
(212) 455-2000 Telephone
(212) 455-2502 Facsimile

-and-

Tyler B. Robinson
Lauren W. Brazier (admitted *pro hac vice*)
**SIMPSON THACHER & BARTLETT LLP**
CityPoint
One Ropemaker Street
London EC2Y 9HU, England
+44-(0)20-7275-6500 Telephone
+44-(0)20-7275-6592 Facsimile

*Counsel to the Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MatlinPatterson Global Opportunities Partners II L.P., *et al.*, | ) Case No. 21-11255 (DSJ) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |

**DEBTORS' OMNIBUS OPPOSITION TO (I) MOTION BY VRG TO CONVERT THESE CASES TO CHAPTER 7 CASES, AND PRIOR THERETO, TO HAVE THIS COURT ABSTAIN FROM ADDRESSING VRG'S CLAIMS, OR, IN THE ALTERNATIVE, TO GRANT VRG RELIEF FROM THE AUTOMATIC STAY; AND (II) MOTION BY VARIGLOG TO CONVERT THESE CASES TO CHAPTER 7 CASES**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: MatlinPatterson Global Opportunities Partners II L.P. (8284); MatlinPatterson Global Opportunities Partners (Cayman) II L.P. (8246); MatlinPatterson Global Partners II LLC (6962); MatlinPatterson Global Advisers LLC (2931); MatlinPatterson PE Holdings LLC (6900); Volo Logistics LLC (8287); MatlinPatterson Global Opportunities Partners (SUB) II L.P. (9209). The location of the Debtors' address is: 600 Fifth Avenue, 22nd Floor, New York, New York 10022.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................1

RELEVANT BACKGROUND ...........................................................................................4

A.    The VRG Claim .....................................................................................................4

B.    The VarigLog Claim ..............................................................................................7

C.    The Debtors' Chapter 11 Filings...........................................................................9

D.    The Pre-Petition Transactions.............................................................................10

ARGUMENT ...................................................................................................................11

A.    Abstention Would Serve No Legitimate Purpose While Obstructing This Court's
Jurisdiction Over Core U.S. Bankruptcy Matters By Permitting A Conflicting
Cayman Islands Liquidation Proceeding .............................................................11

    1.    Relevant Legal Standards ......................................................................12

    2.    There Is No Basis For The Court To Abstain From Administering
Debtors' Estates And Adjudicating Whether VRG's Claim Is Allowable
Under U.S. Law .....................................................................................13

    3.    VRG's Meritless Allegations Of "Fraud" And "Breach of Undertaking"
Do Not Warrant Abstention ...................................................................18

        a.    VRG's Purported Fraud Claim Is Frivolous .............................19

        b.    VRG's "Breach Of Undertaking" Claim Is Frivolous And Cannot
Justify Abstention ...................................................................20

B.    VRG's Alternative Request For Stay Relief Should Be Denied Because It Is
Merely Abstention By Another Name ..................................................................23

C.    Conversion To Chapter 7 Is Contrary To The Best Interests Of The Estates And
Their Stakeholders, And Movants Have Failed To Show Cause For Such Relief ...........24

    1.    Relevant Legal Standards ......................................................................24

    2.    These Cases Were Not Filed In "Bad Faith" ...........................................25

        a.    These Cases Were Filed In Objective Good Faith To Achieve The
Valid Bankruptcy Purpose Of An Orderly, Ratable Liquidation...............26

        b.    These Cases Were Filed In Subjective Good Faith To Accelerate
The Domestication And Disallowance Of Debtors' Lawsuits, Not
To Obtain Improper Litigation Advantage .................................28

3.     Conversion Pursuant to §1112(b)(4)(A) Is Unwarranted ......................................31

       a.     There Is No Substantial Or Continuing Loss To Or Diminution Of
              The Estate.................................................................................................31

       b.     There Is A Reasonable Likelihood Of Rehabilitation................................37

       c.     There Are Unusual Circumstances Warranting A Denial Of
              Conversion ...............................................................................................39

CONCLUSION......................................................................................................................42

# TABLE OF AUTHORITIES

**Cases**

*Alsohaibi v. Arcapita Bank B.S.C.(c) (In re Arcapita Bank B.S.C.(c))*,
   No. 12-11076, 2014 WL 46552 (S.D.N.Y. Jan. 6, 2014) ........................................................ 26

*Everest Capital Ltd. v Everest Funds Management, L.L.C.*,
   178 F. Supp. 2d 459 (S.D.N.Y. 2002) .................................................................................. 18

*Field Station LLC v. Capitol Food Corp. (In re Capitol Food Corp.)*,
   490 F.3d 21 (1st Cir. 2007) .................................................................................................. 25

*Florida Dep't of Revenue v. Piccadilly Cafeterias Inc.*,
   554 U.S. 33 (2008) .............................................................................................................. 26

*Gardner v. New Jersey*,
   329 U.S. 565 (1947) ............................................................................................................ 16

*In re AAGS Holdings, LLC*,
   608 B.R. 373 (Bankr. S.D.N.Y. 2019) ................................................................................. 27

*In re AdBrite Corp.*,
   290 B.R. 209 (Bankr. S.D.N.Y. 2003) ............................................................. 24, 31, 33, 36

*In re Agrokor d.d.*,
   591 B.R. 163 (Bankr. S.D.N.Y. 2018) ................................................................................. 22

*In re All Am. Of Ashburn, Inc.*,
   40 B.R. 104 (Bankr. N.D. Ga. 1984) .................................................................................... 35

*In re Alston*,
   756 F. App'x 160 (3d Cir. 2019) .......................................................................................... 40

*In re Ancona*,
   No. 14-10532, 2016 WL 7868696 (Bankr. S.D.N.Y. Nov. 30, 2016) .............................. 29, 30

*In re Antelope Techs., Inc.*,
   431 F. App'x 272 (5th Cir. 2011) ........................................................................................ 29

*In re Aramid Ent. Fund, LLC*,
   628 B.R. 584 (Bankr. S.D.N.Y. 2021) ............................................................................. 17, 18

*In re Arcapita Bank B.S.C.(c)*,
   575 B.R. 229 (Bankr. S.D.N.Y. 2017) ................................................................................. 18

*In re Ashley Oaks Dev. Corp.*,
   458 B.R. 280 (Bankr. D.S.C. 2011) ...................................................................................... 40

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*,
   374 B.R. 122 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008) ......................... 14

*In re BH S & B Holdings, LLC*,
   439 B.R. 342 (Bankr. S.D.N.Y. 2010) ....................................................................................... 24

*In re Bozel, S.A.*,
   434 B.R. 86 (Bankr. S.D.N.Y. 2010) .................................................................... 12, 13, 14, 23

*In re Copy Crafters Quickprint, Inc.*,
   92 B.R. 973 (Bankr. N.D.N.Y. 1988) ........................................................................................ 24

*In re C-TC 9th Ave. P'ship*,
   113 F.3d 1304 (2d Cir. 1997) ............................................................................................. 29, 30

*In re Dana Corp.*,
   No. 06-10354, 2007 WL 3376882 (Bankr. S.D.N.Y. Nov. 6, 2007),
   *vacated on other grounds*, 574 F.3d 129 (2d Cir. 2009). .................................................. 12, 23

*In re Freeman*,
   540 B.R. 129 (Bankr. E.D. Pa. 2015) ........................................................................................ 28

*In re Gabriel Techs. Corp.*,
   No. 13-30340, 2013 WL 2318581 (Bankr. N.D. Cal. May 28, 2013) ................................. 34, 35

*In re Gen. Growth Props.*,
   409 B.R. 43 (Bankr. S.D.N.Y. 2009) ........................................................................................ 25

*In re HBA East Inc.*,
   87 B.R. 248 (Bankr. S.D.N.Y. 1988) ........................................................................................ 29

*In re Herb Philipson's Army*,
   Case No. 18-61376, 2019 WL 11031654 (Bankr. N.D.N.Y. Dec. 19, 2019) ..................... 36, 39

*In re Insilco Techs., Inc.*,
   480 F.3d 212 (3d Cir. 2007) ...................................................................................................... 26

*In re Kanterman*,
   88 B.R. 26 (S.D.N.Y. 1988) ...................................................................................................... 36

*In re Katerra, Inc.*,
   No. 21-31861 [Docket No. 1212], Oct. 4, 2021 Hr'g Tr.
   (Bankr. S.D. Tex. Oct. 4, 2021) ................................................................................................ 14

*In re Kingston Square Assocs.*,
   214 B.R. 713 (Bankr. S.D.N.Y. 1997) ...................................................................................... 25

*In re Lizeric Realty Corp.*,
   188 B.R. 499 (Bankr. S.D.N.Y. 1995) ................................................................. 38

*In re McKenna*,
   580 B.R. 1 (Bankr. D.R.I. 2017) .......................................................................... 37

*In re MSR Hotels & Resorts, Inc.*,
   No. 13-11512 [Docket No. 157], 2013 WL 5716897,
   Oct. 1, 2013 Hr'g Tr. (Bankr. S.D.N.Y. Oct. 1, 2013).......................... 24, 29, 33, 37

*In re Murray*,
   543 B.R. 484 (Bankr. S.D.N.Y. 2016),
   *aff'd*, 900 F.3d 53 (2d Cir. 2018) ........................................................... 26, 27, 29

*In re Neilson*,
   No. 17-10631, 2018 WL 6982228 (Bankr. N.D.N.Y. Aug. 31, 2018).................... 29

*In re Orbit Petroleum, Inc.*,
   395 B.R. 145 (Bankr. D.N.M. 2008)..................................................................... 40

*In re Prods. Int'l Co.*,
   395 B.R. 101 (Bankr. D. Ariz. 2008) .................................................................... 37

*In re Purdue Pharma L.P.*,
   No. 19-23649 [Docket No. 3786], 2021 WL 4240974
   (Bankr. S.D.N.Y. Sept. 17, 2021) ........................................................................ 28

*In re R & S St. Rose Lenders, LLC*,
   No. 11-14973, 2016 WL 3536533 (Bankr. D. Nev. May 18, 2016) ................. 36, 38

*In re Rimsat, Ltd.*,
   98 F.3d 956 (7th Cir. 1996)................................................................................. 15

*In re Sal Caruso Cheese, Inc.*,
   107 B.R. 808 (Bankr. N.D.N.Y. 1989).................................................................. 24

*In re Schick*,
   232 B.R. 589 (Bankr. S.D.N.Y. 1999) .................................................................. 23

*In re SGL Carbon Corp.*,
   200 F.3d 154, (3d Cir. 1999) .............................................................................. 25

*In re Silberkraus*,
   253 B.R. 890 (Bankr. C.D. Cal. 2000) ................................................................. 29

*In re Sonnax Industries, Inc.*,
   907 F.2d  1280 (2d Cir. 1990)............................................................................. 23

*In re Soundview Elite Ltd.*,
    503 B.R. at 580 ........................................................................................... 26, 27

*In re SPhinX, Ltd*.,
    351 B.R. 103 (Bankr. S.D.N.Y. 2006),
    *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007) ........................................................... 14

*In re Syndicom Corp.*,
    268 B.R. 26 (Bankr. S.D.N.Y. 2001) ........................................................... 31

*In re The 1031 Tax Group, LLC*,
    374 B.R. 78 (Bankr. S.D.N.Y. 2007) ..................................................... 24, 38

*In re TMT Procurement Corp.*,
    534 B.R. 912 (Bankr. S.D. Tex. 2015) .................................................. 33, 34

*In re Tronox*,
    603 B.R. 712 (Bankr. S.D.N.Y. 2019) ......................................................... 13

*In re Waterscape Resort LLC*,
    No. 11-11593, 2013 WL 819748 (Bankr, S.D.N.Y. Mar. 5, 2013) .......... 12, 17

*In re Waterworks, Inc.*,
    538 B.R. 445 (Bankr. N.D. Ill. 2015) ........................................................... 24

*Investors Gr'p, LLC v. Pottorff*,
    518 B.R. 380 (N.D. Tex. 2014) ..................................................................... 29

*Katchen v. Landy*,
    382 U.S. 323 (1966) ...................................................................................... 16

*Loop Corp. v. U.S. Trustee*,
    379 F.3d 511 (8th Cir. 2004) ................................................... 34, 36, 37, 39

*Pawtucket Credit Union v. Picchi* (*In re Picchi*),
    448 B.R. 870 (1st Cir. B.A.P. 2011) ............................................................. 40

*Stern v. Marshall*,
    564 U.S. 462 (2011) ...................................................................................... 16

*Taggart v. Lorenzen*,
    139 S. Ct. 1795 (2019) .................................................................................. 24

*VRG Linhas Aereas S.A. v MatlinPatterson Global Opportunities Partners II L.P.*,
    605 F. App'x 59 (2d Cir. 2015) ....................................................................... 5

*VRG Linhas Aereas S.A. v MatlinPatterson Global Opportunities Partners II L.P.*,
    No. 11 Civ. 0198 (MGC) 2014 WL 4928929 (S.D.N.Y. Oct. 2, 2014) ............ 5

**Statutes**

11 U.S.C. § 1112(b)(2) ........................................................................................... 39

11 U.S.C. § 1129(a)(11) ......................................................................................... 25

11 U.S.C. § 1521(b) ................................................................................................ 22

11 U.S.C. § 326(a) .................................................................................................. 33

11 U.S.C. §§ 1123(a)(5) ......................................................................................... 25

11 U.S.C. §§ 1123(b)(4) ......................................................................................... 26

28 U.S.C. § 157(b)(2)(B) ........................................................................................ 16

Limitation Act (1996 Revision) (Cayman Islands), section 4(1) ........................ 5, 19

N.Y. C.P.L.R. 213(8) ............................................................................................... 5

N.Y. C.P.L.R. 5307 ................................................................................................. 22

**Other Authorities**

1 COLLIER ON BANKRUPTCY ¶ 1.01[1] ..................................................................... 26

156 Cong. Rec. H7158 ............................................................................................ 39

156 Cong. Rec. S10508 .......................................................................................... 39

6 COLLIER ON BANKRUPTCY ¶ 1112.07 .................................................................... 26

7 COLLIER ON BANKRUPTCY ¶ 1106.03 .................................................................... 24

7 COLLIER ON BANKRUPTCY ¶ 1112.04 ................................................................. 31, 38

The above-captioned debtors and debtors-in-possession (collectively, the "***Debtors***") in these chapter 11 cases (the "***Chapter 11 Cases***") respectfully submit this omnibus opposition ("***Opposition***") to the *Motion by VRG for Entry of an Order (I)(A) Converting these Chapter 11 Cases to Cases under Chapter 7, and Prior Thereto (B) Having this Court Abstain from Addressing VRG's Claims in Deference to the Cayman Islands Proceedings, or, in the alternative, (II) Lifting the Automatic Stay with respect to the Cayman Islands Proceedings* [Docket No. 181] (the "***VRG Motion***") and the *Motion by the Foreign Representative of Varig Logistica S.A. to Convert these Chapter 11 Cases to Chapter 7 Cases pursuant to 11 U.S.C. § 1112(b)* [Docket No. 178] (the "***VarigLog Motion***" and together with the VRG Motion, the "***Motions***").[2]

## PRELIMINARY STATEMENT

1.      VRG and VarigLog ("***Movants***") seek to convert these Chapter 11 Cases to Chapter 7 and have them proceed in this Court on that basis.  At a most basic level, their Motions recognize that Debtors' cases *do* belong in this Court as the only jurisdiction that can provide for an orderly, ratable distribution of Debtors' assets for the collective benefit of all creditors and investors who are competing over a limited pool of assets.

2.      Debtors are investment funds at the end of their natural life that seek to return assets to investors.  But they are held up from doing so by multiple, competing foreign lawsuits claiming in excess of their available assets.  Aside from imposing years of delay and erosion of the estates' value, even if these foreign lawsuits result in final judgments, those judgments can only be enforced in the United States, in accordance with U.S. law, where Debtors' assets are located.

---

[2]      This Opposition is accompanied by the Declaration of Elisha D. Graff, dated October 22, 2021, filed in support hereof (the "***Graff Declaration***").

3.      The administration and equitable distribution of Debtors' assets, all located within the United States, to competing stakeholders in accordance with their respective rights is a core function of this Court.  Inherent to that function is the adjudication of VRG's and VarigLog's claims and their allowance or disallowance as a matter of U.S. law in respect of Debtors' U.S. assets.  This remains so whether in Chapter 11 or Chapter 7.  VRG's allegations of "bad faith" are therefore groundless.

4.      It is undisputed that an orderly liquidation is a valid and common purpose of Chapter 11.  The claims reconciliation process is clearly best managed by Debtors as debtors in possession.  Conversion would handicap the estates and destroy value by unseating Debtors' management and professionals who have years of experience with and knowledge of the facts and law of the contested VRG and VarigLog claims.  They would be replaced with a Chapter 7 trustee and all new professionals, who would be entitled to a commission on distributions and would need to expend considerable excess time and resources learning the complex facts and background with which Debtors' existing professionals are already familiar.  Undoubtedly, that is just what VRG and VarigLog seek to achieve by their Motions, to advantage themselves at the expense of the estates and Debtors' other stakeholders.

5.      Debtors have proposed a confirmable plan that pays legitimate creditors in full and contemplates a claims adjudication process that needs to take place regardless of conversion. Debtors should be given the opportunity to prosecute their plan and to address whether either VRG or VarigLog has an allowable claim, with the assistance of their chosen advisors and fiduciaries. It makes no sense to convert these cases at the behest of VRG and VarigLog before this Court has addressed whether either of them has a valid claim.

6.      Nor is there any need for a Chapter 7 trustee to perform some ill-defined investigative function.  Debtors have made full disclosure of their assets and affairs.  The transactions that VRG and VarigLog mislabel "improper" were fully disclosed and plainly taken to protect and maximize the assets of the estates.  Debtors have articulated to this Court *prima facie* good-faith bases under U.S. law for treating the VRG and VarigLog claims as meritless and, in accordance with a fiduciary's duties, taking action to defend against those claims and protect Debtors' assets from them.  Further, all of the assets that were ever available to satisfy any of VRG's or VarigLog's claims remain so, they are before this Court either in Chapter 11 or 7, and they will be distributed as this Court directs.  There is therefore nothing for a Chapter 7 trustee to investigate that makes any practical or legal difference to the estate, its administration, or the rights and entitlements of VRG and/or VarigLog.

7.      VRG's request for abstention or alternatively stay relief seeks broadly to circumvent this Court's jurisdiction by allowing VRG to commence a competing liquidation proceeding in the Cayman Islands.[3]  There is no "cause," let alone "exceptional circumstances," to justify this Court abrogating its core, jurisdictional responsibility to determine as a matter of U.S. law whether VRG may share in the distributions of Debtors' U.S. assets in the light of the Second Circuit's determination that VRG's Brazilian Arbitral Award is a nullity.  This is an issue of U.S. law not Cayman law and it falls squarely within the Court's core, bankruptcy jurisdiction.  Notably, this issue is *not* pending before any other court.  The Privy Council stands to determine merely whether VRG's Brazilian Arbitral Award should be recognized and enforceable *within the*

---

[3]      *See* Aug. 26, 2021 Hr'g Tr. [Docket No. 185] at 18:15–24 ("MR. STEINBERG:  Yeah, I think the recourse would be to go to the grand court of the Cayman Islands and say they violated the undertaking.  The undertaking was obviously put in place in order to get an effect of stay pending appeal of the judgment that we had gotten.  And so we would ask that that would be able to avoid -- if we had the ability to do that, **we'd ask (indiscernible) that there was a violation of the undertaking and because of that that we would want to have the ability to have a Cayman liquidator appointed for [MP Cayman]**.") (emphasis added)

*territorial jurisdiction of the Cayman Islands*.  VRG's transparent ambition in seeking abstention is to commence a future, as-yet unfiled competing liquidation in the Cayman Islands.

8.      Nor is the alleged breach of the Undertaking a basis for VRG to launch a competing insolvency proceeding in Cayman.  As explained below, VRG's breach claim tortures the language of the Undertaking and is frivolous.  But even if a breach of the Undertaking had occurred, it would be of no practical consequence because all of the assets that were ever available to satisfy VRG's claims, if allowed, are (and have always been) in the United States and subject to the administration of this Court.  Whatever a Cayman court might say about the Undertaking, VRG would have to return to this Court to satisfy any claim on the U.S.-based assets that were the subject of the Undertaking, which served merely to ensure their availability in a manner that has not been compromised.  Abstention or stay relief to permit litigation over the Undertaking in the Cayman Islands would therefore merely cause needless delay of and substantial interference with this Court's core bankruptcy function to equitably distribute Debtors' U.S.-sited assets.

9.      For these and the reasons that follow, VRG's and VarigLog's Motions should be denied and these cases should proceed without further delay toward confirmation.

## RELEVANT BACKGROUND

### A.      The VRG Claim

10.     VRG's claims in these Chapter 11 Cases arise from the Brazilian Arbitral Award rendered against MatlinPatterson Global Opportunities Partners II L.P. ("**MP Delaware**") and MatlinPatterson Global Opportunities Partners (Cayman) II L.P. ("**MP Cayman**") (together the "**MP Funds**") on September 2, 2010.[4]  VRG has now spent over a decade litigating the enforceability of this Award.

---

[4]     In re MatlinPatterson Global Opportunities Partners II L.P., No. 21-11255, Claim No. 7; MatlinPatterson Global Opportunities Partners (Cayman) L.P., No. 21-11256, Claim No. 2; MatlinPatterson Global Opportunities

11.     VRG first sought to enforce the Award against the MP Funds in New York in January 2011.  The Parties fully litigated the enforceability of the Award in the United States over the next four and a half years, including two appeals to the Second Circuit.  The U.S. courts determined that the Award is *not enforceable* in the United States against Debtors or their assets, as a matter of federal law and U.S. public policy, because the arbitral tribunal never had jurisdiction over the MP Funds.[5]  The Award, and everything the Brazilian arbitral tribunal purported to adjudicate in respect of the MP Funds, is therefore a nullity under U.S. law.  VRG tries to downplay the import of the (second and final) Second Circuit decision, describing it as a "brief, two page decision" (VRG Motion ¶ 26).  The Second Circuit decision was brief because it was straightforward to affirm the District Court's fully-reasoned determination that the Brazilian arbitral tribunal never had jurisdiction over the MP Funds.

12.     Unhappy with this result, in June 2016, VRG commenced a lawsuit in New York state court alleging fraud claims, by filing and serving a summons against the MP Funds.  When the MP Funds demanded that VRG file its complaint, VRG withdrew the action.[6]  The six-year limitation period for fraud claims, whether in New York or in the Cayman Islands, expired long ago.  By VRG's own telling, it pursued those very same fraud allegations already, in the arbitration in Brazil, such that the Brazilian Arbitral tribunal was able to rule on them for purposes of an

---

Partners (SUB II) L.P., No. 21-11257, Claim No. 2; MatlinPatterson Global Advisers LLC, No 21-11258, Claim No. 3; MatlinPatterson Global Partners LLC, No. 21-11259, Claim No. 2; MatlinPatterson PE Holdings LLC, No. 21-11260, Claim No. 2; Volo Logistics LLC, No. 21-11261, Claim No. 2.

[5]    *VRG Linhas Aereas S.A. v MatlinPatterson Global Opportunities Partners II L.P.*, No. 11 Civ. 0198 (MGC), 2014 WL 4928929, at *2 (S.D.N.Y. Oct. 2, 2014); *VRG Linhas Aereas S.A. v MatlinPatterson Global Opportunities Partners II L.P.*, 605 F. App'x 59, 61 (2d Cir. 2015).

[6]    Summons dated June 29, 2016 to MP Delaware and MP Cayman, attached as **Exhibit A** to the Graff Declaration; Notice of Appearance and Demand for Complaint attached as **Exhibit B** to the Graff Declaration; Notice of Discontinuance attached as **Exhibit C** to the Graff Declaration.

Award that was rendered more than eleven years ago.[7]  VRG's "fraud" claim, for purposes of its Proof of Claim before this Court, is time barred and nothing short of frivolous.

13.    On September 1, 2016, VRG shopped the unenforceable Brazilian Arbitral Award to the courts of the Cayman Islands, to see if those courts would recognize it.  On October 26, 2016, VRG obtained an *ex parte* order recognizing and enforcing the Brazilian Arbitral Award in the Cayman Islands, subject to the MP Funds' right to contest the order.  Rather than allowing the *ex parte* order to stand, the MP Funds commenced an action to overturn it.[8]  While VRG attempts to paint this as "tacit recognition" on the part of the MP Funds that the Second Circuit decision was somehow less than final (VRG Motion ¶ 79), prudent management faced with unmeritorious litigation in the Cayman Islands would *not* forego valid and available defenses in that jurisdiction simply because *other* valid defenses existed to any subsequent enforcement in the United States.

14.    The Cayman trial court concluded that the Brazilian Arbitral Award was unenforceable under Cayman law, not just because the tribunal lacked jurisdiction (as the U.S. courts had found), but also because it violated the MP Funds' due process rights and exceeded the tribunal's arbitral authority.  A Cayman Court of Appeal then reversed.  The enforceability of the arbitral award as a domestic judgment in the Cayman Islands and under Cayman law is now on appeal to the Privy Council, which will address the disagreement between the trial and appellate courts.  A final hearing in the Privy Council has been scheduled for March 8–9, 2022.

15.    The proceeding in Cayman, now pending before the Privy Council, concerns only whether the Brazilian Arbitral Award may be recognized as a domestic Cayman court judgment,

---

[7]    Limitation Act (1996 Revision) (Cayman Islands), section 4(1) (six years); N.Y. C.P.L.R. 213(8) (New York) (six years).

[8]    *See* 2019 Cayman Grand Court Decision, Exh. B-3 ¶¶ 3–5 to the *Declaration of Matthew Doheny, Chief Restructuring Officer of the Debtors, In Support of Chapter 11 Petitions and First Day Motions in Compliance with Local Rule 1007-2* [Docket No. 2] (the "***Doheny Declaration***").

within the territorial jurisdiction of the Cayman Islands, pursuant to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York, 10 June 1958) (the "**New York Convention**"), as adopted by statute into Cayman Islands law.  The U.S. courts have already decided as a matter of U.S. law and U.S. territorial jurisdiction, that the New York Convention, as adopted by statute into U.S. law, does *not* recognize VRG's Brazilian Arbitral Award.  Under the New York Convention enforcement scheme, each and any enforcing country is entitled to determine the enforceability of a foreign arbitral award within its own territorial jurisdiction, for itself.  The issue before *this* Court is therefore one of U.S. law, not Cayman law: Whether any final recognition in Cayman of VRG's Brazilian arbitral award, even assuming that outcome, is enforceable against Debtors and their assets in the United States when the Second Circuit has already determined for U.S. law and jurisdictional purposes that the Brazilian Arbitral Award is *not* enforceable here.

###### B.    The VarigLog Claim

16.    VarigLog's claims in these Chapter 11 Cases are based on a lawsuit filed in Brazil by the representative of VarigLog's estate, on behalf of VarigLog, seeking to hold Debtors liable for the entirety of VarigLog's Brazilian bankruptcy debt (approximately $386.9 million according to VarigLog's proof of claims), on the basis that Debtors abused their control of VarigLog so as to cause its bankruptcy in Brazil.  This lawsuit, premised on facts and events dating from more than a decade ago, was commenced by VarigLog's representative only in May 2020, after the representative applied to the Brazilian bankruptcy court and received the right to collect a contingency-fee percentage of any assets recovered on behalf of the VarigLog estate.[9]  This

---

[9]    In re MatlinPatterson Global Opportunities Partners II L.P., No. 21-11255, Claim Nos. 4–6; Order of the Brazilian Bankruptcy Court dated April 16, 2018 a copy of which is attached as **Exhibit D** to the Graff Declaration; VarigLog Verified Petition for Chapter 15 Relief and Recognition of Foreign Proceeding, Docket No. 2, No. 09-15717-RAM (Bankr. S.D.Fla. 2009) ¶ 26 ("On March 13, 2009, the Brazilian Court entered an Order

occurred more than a decade after VarigLog's judicial restructuring proceedings began in Brazil, during which time VarigLog's representative had repeatedly reported to the Public Attorney of São Paulo that VarigLog's demise had been caused by facts having nothing to do with Debtors.[10]

17.    VarigLog's claims are barred by two New York-law governed Debt Assumption Agreements, dating from 2009.  Under the Debt Assumption Agreements certain of the Debtors, as lenders to VarigLog, in an effort at that time to improve VarigLog's financial position, agreed to release VarigLog from $250 million in debt obligations which VarigLog owed to them.  In exchange, VarigLog broadly released and indemnified Debtors against any claims relating to the parties' relationship prior to December 31, 2008.

18.    The contingency-fee claims brought by VarigLog in May 2020 fall squarely within the terms and scope of the New York-law releases and indemnifications contained in the Debt Assumption Agreements.  The claims are also precluded at this point by the New York-law doctrines of ratification and equitable estoppel.  In sum, Debtors have some half-dozen U.S. law reasons why VarigLog's claims are meritless and should be disallowed.

19.    The Brazilian action is expected to take 9–15 years to be fully adjudicated in Brazil.[11]  Even then, the most VarigLog could hope for is a judgment that it would not be able to enforce without commencing an action in the United States (where all of Debtors' assets are located), at which point the Debtors would raise U.S. law by way of defense.  All roads lead to U.S. adjudication; only these Chapter 11 Cases provide a procedural path that avoids at least a

---

authorizing the processing of the Recuperação Judicial (the "Bankruptcy Order")"), a copy of which is attached as **Exhibit E** to the Graff Declaration.

[10]    Doheny Decl. ¶ 65; Reports from VarigLog's Court-Appointed Trustee dated August 12, 2013, November 24, 2014, May 18, 2016 and September 16, 2020 and translations of excerpts thereof, attached as **Exhibit F** to the Graff Declaration.

[11]    *Id.* ¶ 68.

decade of costly and unnecessary litigation in Brazil, and affords protection to Debtors' other

stakeholders with competing claims to Debtors' U.S. assets.

### C.        The Debtors' Chapter 11 Filings

20.        The Debtors have filed the Chapter 11 Cases in good faith, as demonstrated by

undisputed facts.  These Chapter 11 Cases were filed because the MP Funds are at the end of their

life and, consistent with the fiduciary duties they owe to their limited-partner investors, seek an

orderly distribution of their assets, net of valid creditor claims, back to their investors.  The MP

Funds have been unable to do this outside of bankruptcy because they are faced with foreign

litigation claims by VRG, VarigLog and HJDK, all seeking recourse to the same limited pool of

available assets located in the United States.   In addition to the litigation claimants, there are

hundreds of bona fide third party stakeholders for whose benefit these Chapter 11 Cases are being

administered.[12]   Fund II-A, as creditor to Debtors, is itself just another fund representing third-

party limited partners.  Debtors therefore sought the assistance of this Court, as the only forum

with jurisdiction to provide a centralized administration of Debtors' assets, for the benefit of all

stakeholders, and given the fact that as foreign claimants all of VRG, VarigLog and HJDK, even

if successful on their claims abroad, would have to return before a U.S. court anyway to have

recourse to the assets located here.  All of the Debtors' assets are, *and always have been*, located

in the United States.[13]  Likewise, all of the Debtors maintain, *and have always maintained*, their

---

[12]    *See* List of Equity Security Holders of MP Delaware [Docket No. 180], List of Equity Security Holders of MP
Cayman [Docket No. 182], List of Equity Security Holders of MP SUB II [Docket No. 183].

[13]    Doheny Decl. ¶ 89.  This is undisputed by VRG and VarigLog in their Motions, after having received through the
parties' voluntary production of documents, *inter alia*, copies of the U.S. bank account statements where the
assets have been held, going back many years and for as long as such statements are available.

principal place of business in the United States.[14]  This Court is therefore the appropriate forum to

facilitate the winding up of the Debtors' affairs.

### D.     The Pre-Petition Transactions

21.     VRG and VarigLog continue to complain about certain pre-petition transactions,

which they seek appointment of a Chapter 7 Trustee to investigate, in place of Debtors' appointed

CRO whom they allege cannot act in a fiduciary capacity because he was involved in the subject

transactions.[15]

22.     The transactions concerned simply have no legal relevance to the Motions or to the

administration of these bankruptcy cases.  *First,* Movants have now conceded that these cases—

in one form or another—belong before this Court.  This Court will distribute Debtors' U.S. assets.

All of the assets that were ever available to satisfy any creditor claims have always been in the

United States and indisputably remain so; those assets are before this Court, and can and will be

distributed as this Court directs.  None of the complained of transactions have placed any estate

assets beyond the reach of this Court for the benefit of any holders of allowed claims.

23.     Further, Debtors have *prima facie* demonstrated to this Court good-faith, U.S. law

reasons for treating the claims of VRG and VarigLog as meritless and unallowable.[16]  Debtors and

their fiduciaries are entitled as a matter of law and consistent with their fiduciary obligations to

defend themselves from Movants' claims under U.S. law and to protect their assets from those

claims.  The transactions concerned, on their face and by their terms, were legal measures (taken

on privileged advice of counsel) to protect the value of the estate from VRG's and VarigLog's

---

[14]   This is also undisputed after VRG and VarigLog sought and received in voluntary production the documents
confirming Debtors' principal place of business.

[15]   *See* VRG Motion ¶¶ 8–11, 33–41; VarigLog Motion ¶¶ 6–9.

[16]   *See, e.g.,* Limited Bar Date Motion [Docket No. 10].

unenforceable, foreign lawsuits. There is simply no scope to argue that these transactions were "improper" or a breach of fiduciary duty when all of the assets that were ever available remain so before this Court and when the transactions were in furtherance of *prima facie* good-faith legal defenses grounded in U.S. law.[17]

## ARGUMENT

**A.   Abstention Would Serve No Legitimate Purpose While Obstructing This Court's Jurisdiction Over Core U.S. Bankruptcy Matters By Permitting A Conflicting Cayman Islands Liquidation Proceeding**

24.   VRG seeks abstention in respect of "all issues relating to VRG's claims against the MP Defendants" as defined in its Proofs of Claim.[18] VRG fails to identify any particular Cayman law issues from which it believes this Court should abstain or how a further proliferation of foreign proceedings would advance the resolution of Debtors' U.S. bankruptcy proceedings. This is because VRG seeks nothing short of an opportunity to commence an as-yet, unfiled Cayman liquidation proceeding, in an effort to secure a 'race-to-the-courthouse' advantage over Debtors' other creditors and stakeholders and to avoid the Second Circuit's determination that VRG has no valid claim under U.S. law. While VRG's Motion papers do not make this ambition express, VRG's counsel did so when questioned by the Court about VRG's desire to litigate over the Undertaking in a Cayman court, during the August 26 hearing.[19] As VRG would have it, a would-

---

[17]   Moreover, the fact that the CRO was hired (and could theoretically be fired) by the Debtors' management or board of directors is a non-issue. Chief restructuring (or any) officers by definition must be hired by incumbent management or directors, and the ability to fire the officer is naturally maintained by the incumbents that hired the officer in the first place. Essentially, VRG and VarigLog seek to cast aspersions on the CRO's independence because they do not like the decisions the CRO has made. But the litigation claimants cannot substitute their judgment for that of the Debtors' fiduciaries.

[18]   VRG Motion ¶¶ 4, 42.

[19]   *See* Aug. 26, 2021 Hr'g Tr. [Docket No. 185] at 18:15–24 ("MR. STEINBERG: Yeah, I think the recourse would be to go to the grand court of the Cayman Islands and say they violated the undertaking. The undertaking was obviously put in place in order to get an effect of stay pending appeal of the judgment that we had gotten. And so we would ask that that would be able to avoid -- if we had the ability to do that, *we'd ask (indiscernible) that there was a violation of the undertaking and because of that that we would want to have the ability to have a Cayman liquidator appointed for [MP Cayman].*") (emphasis added)

be Chapter 7 trustee before this Court would then merely serve to investigate and undo the pre-petition transactions, so as to facilitate VRG's end-run of this Court's jurisdiction in Cayman.

25.     VRG's abstention motion seeks to: (i) avoid controlling Second Circuit law; (ii) have this Court abrogate its core jurisdiction to administer Debtors' assets, located exclusively in the United States, in deference to a future Cayman Islands liquidation proceeding; and (iii) deprive Debtors and their legitimate stakeholders of the only centralized forum that can resolve all parties' respective rights to a ratable share of Debtors' limited pool of assets.  Accordingly, abstention should be denied.

### 1.     Relevant Legal Standards

26.     VRG bears the burden of establishing that permissive abstention under § 1334(c)(1) is warranted.  *In re Waterscape Resort LLC,* No. 11-11593, 2013 WL 819748, at *2 (Bankr. S.D.N.Y. Mar. 5, 2013).  As a starting proposition, there is a "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Id.*  Abstention should therefore be exercised sparingly and only in "narrow circumstances." *In re Bozel, S.A.*, 434 B.R. 86, 102 (Bankr. S.D.N.Y. 2010).

27.     In particular, "bankruptcy courts are not required to abstain from deciding issues which are of central importance to the integrity of the bankruptcy process." *In re Bozel, S.A.*, 434 B.R. at 102.  Where the issue involves a matter within the bankruptcy court's core jurisdiction, such as the allowance or disallowance of claims, abstention requires "exceptional circumstances." *See In re Dana Corp.*, No. 06-10354, 2007 WL 3376882, at **6, 8 (Bankr. S.D.N.Y. Nov. 6, 2007) ("[A] movant must show 'exceptional circumstances' to warrant permissive abstention where the claim, as here, involves a matter within the bankruptcy court's core jurisdiction", and "nothing is more directly at the core of bankruptcy administration than the quantification of all liabilities of the debtor."), *vacated on other grounds*, 574 F.3d 129 (2d Cir. 2009).

12

28.    Courts in this District consider twelve factors to assist in determining whether permissive abstention is appropriate: (1) the effect or lack thereof on the efficient administration of the estate; (2) the extent to which state law issues predominate over bankruptcy issues; (3) the difficulty or unsettled nature of the applicable state law; (4) the presence of a related proceeding commenced in a non-bankruptcy court; (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334; (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (7) the substance rather than form of an asserted "core" proceeding; (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court; (9) the burden of the court's docket; (10) whether there is forum-shopping; (11) the right to jury trial; and (12) the presence in the alternative proceeding of non-debtor parties. *E.g., In re Tronox*, 603 B.R. 712, 726 (Bankr. S.D.N.Y. 2019).  Although these twelve factors refer to state law claims, the same factors govern abstention in favor of foreign proceedings. *In re Bozel, S.A.*, 434 B.R. at 102.

### 2.    There Is No Basis For The Court To Abstain From Administering Debtors' Estates And Adjudicating Whether VRG's Claim Is Allowable Under U.S. Law

29.    VRG seeks to have a Cayman Islands court determine, in some future Cayman Islands liquidation proceeding, whether VRG's claims against Debtors should be allowed to share in distributions of Debtors' U.S. assets administered in this Court.  Applying the relevant abstention factors here, there are no "exceptional circumstances" to warrant this result.  To the contrary, VRG is plainly attempting to evade Second Circuit law and to achieve litigation advantage over Debtors' other stakeholders in an alternative forum which lacks jurisdiction over Debtors' U.S. assets.  The core function of this Court and the Bankruptcy Code is to *prevent* what VRG hopes to achieve.

30.     *The effect or lack thereof on the efficient administration of the estate.*   "The mere existence of an alternative forum is insufficient cause for a court to exercise permissive abstention, particularly when deferring to an alternate forum could negatively impact the administration of a debtor's Chapter 11 case." *In re Bozel, S.A.*, 434 B.R. at 494–95; *see also* Bench Decision, *In re Katerra, Inc.*, No. 21-31861 [Docket No. 1212], Oct. 4, 2021 Hr'g Tr. at 96:17–97:12 (Bankr. S.D. Tex. Oct. 4, 2021) (refusing to lift stay in favor of English proceedings for claims to be pursued against Debtors that would plainly impact the bankruptcy case).  The Debtors' principal place of business, and all of their assets are (and always have been) located in the United States.  The courts of this District have held that entities like Debtors, including MP Cayman, do not belong in liquidation in the Cayman Islands but rather before a U.S. bankruptcy court, and that only a U.S. court should decide how such debtors' assets are to be distributed in bankruptcy.  *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 129 (Bankr. S.D.N.Y. 2007) (declining to recognize pending liquidation proceedings in Cayman as either foreign main or non-main proceedings where investment funds' only connection to the Cayman Islands was that they were registered there while the investment manager, back-office operations, and all of the funds' liquid assets were located in the United States), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008); *In re SPhinX, Ltd.*, 351 B.R. 103, 119 (Bankr. S.D.N.Y. 2006) (denying petition to recognize Cayman insolvency proceedings as foreign main proceedings on the basis that "[w]ith the exception of corporate minute books and similar records, the JOLs have not identified any assets located in the Cayman Islands; thus the JOLs and the Cayman Court would have to seek assistance from other courts (primarily this Court because most of the assets are in the U.S.) to realize on the SPhinX Funds' assets that will go to pay creditors and investors."), *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007).

31.     Abstention in respect of VRG's claim would not only be contrary to the case law, it would be the epitome of administrative *inefficiency*.  VRG seeks to fracture the administration and distribution of Debtors' assets across competing jurisdictions.  The Cayman Islands would not have jurisdiction to administer Debtors' assets, nor to adjudicate all stakeholders' claims in respect of those assets, and would require the assistance from this Court in aid of any distribution scheme.  The efficacy of a bankruptcy proceeding "depends on the court's ability to control and marshal the assets of the debtor wherever located"; only this Court has that ability.  *In re Rimsat, Ltd.*, 98 F.3d 956, 961 (7th Cir. 1996) (affirming, *inter alia*, that abstention was not required where "all of Rimsat's assets (save a bank account with only $1,700 in it), creditors, and shareholders are located outside of Nevis", making Nevis an inconvenient forum).  Further, it would be inefficient to derail these Chapter 11 Cases in favor of a future insolvency proceeding in a foreign jurisdiction, when these Cases are already three months in, have resolved substantive motions, have a confirmable plan on file and in respect of which this Court is now well familiar.

32.     *The extent to which Cayman law issues predominate and the difficult or unsettled nature thereof*.  Cayman law issues are not predominant.  They are not even relevant.  The proceedings currently pending in Cayman only concern the MP Defendants' appeal of whether the Brazilian Arbitral Award should be recognized *in the Cayman Islands as a Cayman Islands judgment*.  The parties have already stipulated to modify the automatic stay to allow that appeal to proceed, so abstention is not at issue regarding the appeal.[20]  Whether the Brazilian Arbitral Award is recognized in the Cayman Islands is *irrelevant* to the administration of these Chapter 11 Cases.  Rather, the central issue before this Court is whether the Second Circuit decision requires

---

[20]    The Debtors have done so for the obvious and simple reason that it is *their appeal* and a 'free shot on goal' if they prevail, as they already did before the Cayman trial court.

disallowance of VRG's claim, in any event, because it is unenforceable in the United States.  This is an issue of U.S. law and is not an issue that a Cayman Islands court should decide.  Rather, it is a core bankruptcy function for this Court to perform that does not implicate Cayman Islands law at all.  *See* 28 U.S.C. § 157(b)(2)(B); *see also Stern v. Marshall*, 564 U.S. 462, 499 (2011) (bankruptcy courts have the constitutional authority to decide issues that "would necessarily be resolved in the claims allowance process"); *Katchen v. Landy*, 382 U.S. 323, 329 (1966) ("[T]he expressly granted power to 'allow', 'disallow' and 'reconsider' claims . . . is of 'basic importance in the administration of a bankruptcy estate.'"); *Gardner v. New Jersey*, 329 U.S. 565, 573 (1947) ("When objections [to proofs of claim] are made, [the bankruptcy court] is duty bound to pass on them.  That process, is, indeed, of basic importance in the administration of a bankruptcy estate.").

33.     *The presence of a related proceeding commenced in the Cayman Islands*.  For the reasons already explained, there is no pending proceeding in the Cayman Islands to adjudicate the issue before this Court of whether VRG's claim is unenforceable as a matter of U.S. law against Debtors' U.S. assets.

34.     *The jurisdictional basis, if any, other than 28 U.S.C. § 1334*.  A U.S. Court would need to adjudicate in any event the enforceability against U.S.-sited assets, under U.S. law, of a Cayman judgment recognizing VRG's Brazilian Arbitral Award within the territorial jurisdiction of the Cayman Islands.  Jurisdiction over the issue that is before this Court is therefore appropriately before this Court, not a Cayman court, quite apart from § 1334.

35.     *The degree of relatedness or remoteness of the proceeding to the main bankruptcy case and substance/form of an asserted "core" proceeding*.  The fair and equitable distribution of Debtors' U.S. assets to their stakeholders is core to this Court's bankruptcy function to provide a centralized and collective remedy, and a lynchpin to the resolution of the Chapter 11 Cases.  *See*

*In re Aramid Ent. Fund, LLC,* 628 B.R. 584, 600 (Bankr. S.D.N.Y. 2021) (this factor counselled "strongly against permissive abstention" where the action in question was "inextricably intertwined" with the bankruptcy); *In re Waterscape Resort LLC*, 2013 WL 819748, at *3 (declining to abstain from hearing claim objection because "[t]he resolution of the claim objection is intertwined with the effective administration of the bankruptcy case. The Court cannot fully administer the case and enter a final decree until the claims objections are resolved.").

36.    *The feasibility of severing non-bankruptcy issues from core bankruptcy matters to allow judgments to be entered in another court with enforcement left to the bankruptcy court.* VRG seeks to have this Court abdicate to a foreign court its core function of adjudicating the enforceability of a foreign judgment against Debtors' U.S. assets. There is no non-bankruptcy issue that VRG seeks to sever (apart, perhaps from the breach of Undertaking issue, the pointlessness of which is addressed below).

37.    *The burden on the court's docket.* While the Court is in the best position to determine this factor, Debtors respectfully submit that (i) allowing and disallowing claims is a routine part of this Court's day-to-day activity, (ii) the allowance or disallowance here of VRG's claim is purely a matter of U.S. law and this Court's core bankruptcy function, and (iii) the burden is modest because the U.S. Courts have already determined that VRG's Brazilian Arbitral Award is unenforceable in the United States.

38.    *The likelihood that proceeding in bankruptcy court involves forum-shopping.* As discussed below, Debtors filed these Chapter 11 Cases expressly for the purpose of facilitating their winding up and the fair and efficient distribution of a limited pool of assets to stakeholders holding competing claims and interests and asserting them in multiple fora where all parties are not present. The cases are also properly venued in this District because Debtors' principal place

of business is here, as are their assets.  It is VRG that is forum shopping, seeking to take another bite of the apple in the Cayman Islands after having failed to enforce its Brazilian Arbitral Award before the U.S. Courts.  *See Everest Capital Ltd. v Everest Funds Management, L.L.C.*, 178 F. Supp. 2d 459, 470 (S.D.N.Y. 2002)  ("Forum shopping occurs when a litigant selects a forum with only a slight connection to the factual circumstances of his action, or where forum shopping alone motivated the choice."); *In re Aramid Ent. Fund, LLC,* 628 B.R. at 600 (Movant could not avail itself of forum shopping when "he is at least as guilty of forum shopping as Defendants may be", having made a "knowing choice" not to participate in the bankruptcy case and then made a "subsequent effort to engineer a supposedly distinct state-court action" which could "be characterized as forum-shopping"); *In re Arcapita Bank B.S.C.(c)*, 575 B.R. 229, 236 (Bankr. S.D.N.Y. 2017) (declining to abstain from considering an avoidance claim in respect of transactions governed by Bahraini law, where the transfers took place through the use of correspondent bank accounts in the United States and the funds received into New York bank accounts were "at the heart of the cause of action").

39.     *The right to jury trial*.  This factor has no role to play on VRG's Motion and therefore weighs against abstention.  VRG does not allege otherwise.

40.     *The presence in the alternative proceeding of non-debtor parties*.  There are no non-debtor parties in the Cayman Islands proceeding, and there are no non-debtor parties in the Cayman Islands that are not also parties to these Chapter 11 Cases.

41.     In sum, *all twelve factors* weigh against abstention.

### 3.      VRG's Meritless Allegations Of "Fraud" And "Breach of Undertaking" Do Not Warrant Abstention

42.     In an attempt to make its claim appear to be about more than just the non-enforceability of the Brazilian Arbitral Award in the United States, VRG manufactures claims for

"fraud" and "breach of the Undertaking."  Both are genuinely frivolous.  They cannot warrant the time, cost and resource inefficiency of permitting VRG to pursue them in a Cayman court, while this Court abstains from administering these Chapter 11 Cases.

a.       *VRG's Purported Fraud Claim Is Frivolous*

43.       VRG's purported fraud claim is premised upon factual findings contained in the nullified Brazilian Arbitral Award rendered in 2010.[21]  Manifestly, VRG has been on notice of those facts since well before 2010, inasmuch as they were before the arbitral tribunal and addressed in its Award.  Whether in the Cayman Islands or New York (being the only jurisdictions in which VRG could get jurisdiction over the MP Funds), any such fraud claim is clearly time barred.[22]  VRG knows this perfectly well.  After it had lost its bid to recognize the Brazilian Arbitral Award in New York, VRG filed a fraud lawsuit against the MP Defendants in New York state court.[23]  VRG then promptly and voluntarily withdrew its own lawsuit in 2016, in favor of pursuing recognition of the Brazilian Arbitral Award in the Cayman Islands.  It is far too late for VRG to pretend as if it has a fraud claim against the MP Defendants.  VRG has made no attempt on its Motion to substantiate such a claim, or to address that it is time barred.  This Court should not entertain the "extraordinary" relief of abstention so that VRG can supposedly pursue a fraud claim in Cayman that is facially frivolous.

---

[21]   VRG attempts to disguise these findings as findings of fact made by the Cayman Court of Appeal (VRG Motion ¶ 21).  But the Cayman Court of Appeal did not find any such facts—it simply recited passages of the underlying arbitral award—which the U.S. Courts have determined was rendered without jurisdiction and is therefore a nullity.  Nor was it open to the Cayman Court of Appeal to make findings of fact in relation to the underlying dispute that was the subject of arbitration.

[22]   Limitation Act (1996 Revision) (Cayman Islands), section 4(1) (six years); N.Y. C.P.L.R. 213(8) (New York) (six years).

[23]   *See* Exhs. A–C to the Graff Declaration.

          b.      *VRG's "Breach Of Undertaking" Claim Is Frivolous And Cannot Justify Abstention*

44.     VRG has not and cannot articulate a viable claim that Debtors have breached the Undertaking. Even if VRG could do so, any such claim implicates issues of U.S. law that it would be for this Court to resolve and is ultimately of no practical consequence to these Chapter 11 Cases.

45.     *First*, VRG's allegation that there has been a "breach" of the Undertaking is devoid of merit on the face of the Undertaking. The Undertaking provided at the relevant time and by its plain terms as follows: "*The General Partner, in its capacity as general partner of the MP Funds confirms that it will continue . . . not to take steps to dispose of its assets such that it will be unable to satisfy the judgment pending the final determination of our clients' intended appeal to the Privy Council.*" VRG alleges this commitment was breached by the transfer of assets and liabilities in October 2020[24] from MP Cayman to SUB II (a Delaware Limited Partnership of which the General Partner of MP Cayman and MP Delaware is also the General Partner) because VarigLog brought a lawsuit in Brazil in May 2020, seeking damages in excess of the MP Defendants' assets. According to VRG, the contribution of assets and liabilities to SUB II compromised the MP Defendants' ability to pay VRG in the event that the MP Defendants also have to pay VarigLog. VRG Motion ¶ 39.

46.     The Contribution and Distribution Agreement did not breach the Undertaking's terms because it did not "dispose" of the assets available to the General Partner such that it (the General Partner) became "unable" to use those funds to pay the Cayman judgment while the Privy Council appeal remains pending. After the SUB II transaction, the General Partner continued to

---

[24] The SUB II contribution and otherwise the only actions VRG posits as being in "breach" of the Undertaking occurred after the parties' exchange of correspondence concerning the Undertaking in mid-August 2020. Accordingly, the terms of the Undertaking in issue (which is contractual in nature) are those in existence as of, and after August 17, 2020, as confirmed by VRG's timeline chart. VRG Motion at 4, ¶ 10.

retain the same control it exercised before the transaction over the $37 million contributed to SUB II, because the General Partner of MP Cayman is also the general partner of SUB II. Moreover, under the Contribution Agreement, SUB II is obliged to discharge MP Cayman's liabilities. The General Partner also continued to have more than ample assets at its disposal from MP Delaware to comply with the Undertaking.

47.    The VarigLog lawsuit commenced in May 2020 is of no relevance to the Undertaking. It has no genuine prospect of concluding in a final, enforceable judgment against Debtors prior to when VRG itself notes the Privy Council appeal will be decided and the Undertaking terminates. The Undertaking only applies while the Privy Council Appeal is pending. Further, the Undertaking by its plain terms regulates disposals of assets; it made no promise whatsoever to *pay* any judgment or (as would be impossible for the General Partner to control) that some other creditor might not sue the same MP Defendants subsequently, and assert a competing and contingent litigation claim in a bankruptcy scenario. VRG invents this notion out of whole cloth.

48.    *Second*, even if VRG was correct that some violation of the Undertaking occurred, it is of no practical or legal consequence. The Undertaking is merely a contractual agreement that served, in accordance with its terms, to prevent assets from being disposed of below a level sufficient to satisfy VRG's Brazilian Arbitral Award claim, while the Privy Council appeal is pending. Assets have not been disposed. They remain within the control of the General Partner that gave the Undertaking; they are part of the estates being administered in this Court; and they are before the Court and will be distributed as the Court directs. If VRG's claim is allowed by this Court, it will have a claim against the assets in accordance with the priorities of the Bankruptcy Code. If VRG's claim is disallowed, then the whole issue is moot and VRG, who would in all

events require the assistance of this Court to enforce against U.S. assets of MP Cayman and SUB II, has suffered no conceivable loss because all the Undertaking ever served to do was merely preserve assets sufficient to satisfy the Brazilian Arbitral Award.

49.    Therefore, the notion that the Undertaking gives rise to some sort of "new" claim affording VRG rights greater than those it has under the Brazilian Arbitral Award is wrong. VRG is either entitled under U.S. law to payment on the arbitral award or it is not. VRG's "breach of Undertaking" claim is simply a gimmick to start a competing liquidation proceeding in the Cayman Islands and subvert this Court's jurisdiction. This is manifestly inappropriate.

50.    Finally, even if VRG successfully obtained any type of Cayman judgment in respect of the Undertaking, VRG would ultimately end up back in front of this Court arguing further issues of U.S. law in order to have recourse against Debtors' U.S. assets. Any claw back of the assets contributed by MP Cayman to SUB II implicates events that took place in the United States under U.S. law. The Contribution and Distribution Agreement is governed by Delaware law; SUB II is a Delaware Limited Partnership; the transfer that is the subject of the dispute occurred within the United States; and the assets are held by SUB II in bank accounts in the United States. Both MP Cayman and SUB II are now before this Court and subject to its jurisdiction. *See also* N.Y. C.P.L.R. 5307 (a foreign country judgment is enforceable in New York only once a court recognizes such judgment) and 11 U.S.C. § 1521(b) (even after recognition of a foreign proceeding, foreign representative must seek court authorization to "distribute" the assets); *In re Agrokor d.d.*, 591 B.R. 163, 188 (Bankr. S.D.N.Y. 2018) ("distribution" under § 1521(b) refers to removing assets from the United States).

51.    VRG comes nowhere close to demonstrating the kind of exceptional circumstances required for this Court to abstain while litigation over the Undertaking ensues in a Cayman court.

22

Tellingly, VRG has offered no timeframe for the Undertaking claim to be addressed in the Cayman Islands, simply asserting that deferral to the Cayman courts will not "unduly delay" these cases (VRG Motion ¶ 73(iii)). But absent VRG successfully initiating a competing insolvency process in the Cayman Islands, as is its true ambition on this Motion, the Undertaking claim would likely involve a Grand Court hearing and subsequent appeals through the Cayman Islands courts just as in the current Cayman Proceeding, which has been ongoing for five *years*. *See In re Bozel, S.A.*, 434 B.R at 103 (denying motions to abstain and grant relief from stay where a five *month* delay in the Luxembourg Court would render the Chapter 11 case "stagnant"). There is no basis for entertaining years of sideshow litigation in Cayman over a frivolous "breach" of the Undertaking claim, the outcome of which makes no discernable difference.

### B.    VRG's Alternative Request For Stay Relief Should Be Denied Because It Is Merely Abstention By Another Name

52.     VRG moves in the alternative for relief form the automatic stay to allow VRG to "fully prosecute its claims in the Cayman Islands."[25] This is the same as abstention; it would afford VRG the opportunity to commence a competing liquidation proceeding in the Cayman Islands to fracture this Court's core jurisdiction. The factors to be considered by the Court in determining whether to exercise permissive abstention are virtually identical to the factors considered in deciding whether to lift the automatic stay. *In re Dana Corp.*, 2007 WL 3376882, at *3. *See also In re Schick*, 232 B.R. 589, 600 (Bankr. S.D.N.Y. 1999) (Denying relief from stay and noting "[T]he considerations that drive an abstention motion coincide with the most relevant *Sonnax* factors, to wit, judicial economy and efficient administration.").[26] For the same reasons

---

[25]    VRG Motion ¶ 75.

[26]    The *Sonnax* factors referred to are: (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for

explained above with respect to abstention, no cause exists to grant relief from the automatic stay to enable VRG to commence a competing liquidation proceeding in the Cayman Islands.

### C.    Conversion To Chapter 7 Is Contrary To The Best Interests Of The Estates And Their Stakeholders, And Movants Have Failed To Show Cause For Such Relief

#### 1.    Relevant Legal Standards

53.    Section 1112 provides that a bankruptcy court may convert a case from Chapter 11 to Chapter 7 upon a showing of cause. *In re BH S & B Holdings, LLC*, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010). "The moving party has the burden of demonstrating cause" for conversion. *Id.*; *In re AdBrite Corp.*, 290 B.R. 209, 218 (Bankr. S.D.N.Y. 2003). "Cause" must be assessed against the backdrop that conversion is a "drastic measure" and should not be done prematurely. *In re Waterworks, Inc.,* 538 B.R. 445, 460 (Bankr. N.D. Ill. 2015) (quoting *In re Sal Caruso Cheese, Inc.*, 107 B.R. 808, 817 (Bankr. N.D.N.Y. 1989)). Only once a court determines that "cause" exists does the court decide whether conversion is in the best interests of the creditors and the estate. *BH S & B Holdings*, 439 B.R. at 346. A bankruptcy court has broad equitable discretion to determine if cause exists and how to ultimately adjudicate the case. *In re The 1031 Tax Group, LLC*, 374 B.R. 78, 93 (Bankr. S.D.N.Y. 2007); *BH S&B Holdings,* 439 B.R. at 346.

54.    Where debtors' assets or liabilities are comprised of multiple complex lawsuits, Chapter 11 provides the most efficient method of achieving an orderly liquidation because debtors and their advisers are familiar with the nature of the lawsuits and can best manage them. Courts have specifically recognized that an orderly liquidation under Chapter 11 is a better option than

---

defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms. *In re Sonnax Industries, Inc.*, 907 F.2d 1280, 1285 (2d Cir. 1990).

liquidation under Chapter 7 in these circumstances.  Bench Decision, *In re MSR Hotels & Resorts, Inc.*, No. 13-11512 [Docket No. 157], 2013 WL 5716897, Oct. 1, 2013 Hr'g Tr. at 43:3–12 (Bankr. S.D.N.Y. Oct. 1, 2013) (citing *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 985–86 (Bankr. N.D.N.Y. 1988)); *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1803 (2019) ("[A] chief purpose of the bankruptcy laws [is] to secure a prompt and effectual resolution of bankruptcy cases within a limited period.") (internal quotations omitted); 7 COLLIER ON BANKRUPTCY ¶ 1106.03.

### 2.    These Cases Were Not Filed In "Bad Faith"

55.    VRG contends that cause for conversion exists because these Chapter 11 Cases were filed in bad faith, essentially on the basis that they have precluded VRG from seeking first-to-the-courthouse, preferential relief in the Cayman Islands to the detriment of Debtors' other stakeholders in respect of Debtors' limited assets, all of which are (and always have been) located in the United States.  But *preventing* such an outcome, in favor of affording all stakeholders a collective remedy, in a central forum capable of distributing estate assets ratably and in accordance with law, is *precisely* one of the purposes the Bankruptcy Code was designed to serve.  These Chapter 11 Cases were filed, and are being administered, in good faith.

56.    Conversion for a bad faith filing should be exercised "only sparingly and with great caution."  *In re Gen. Growth Props.*, 409 B.R. 43, 56 (Bankr. S.D.N.Y. 2009).  In the Second Circuit, a bad faith filing requires a showing of *both* "objective" and "subjective" bad faith.  *Id.* (citing *In re Kingston Square Assocs.*, 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997)).  Federal courts of appeal have framed the inquiry as (a) whether the petition serves a valid bankruptcy purpose and (b) whether the petition was filed merely to obtain tactical litigation advantages in an alternative forum, outside of bankruptcy.  *Field Station LLC v. Capitol Food Corp.* (*In re Capitol Food Corp.*), 490 F.3d 21, 24 (1st Cir. 2007) (quoting *In re SGL Carbon Corp.*, 200 F.3d 154, 163, 165 (3d Cir. 1999)).  Neither factor supports VRG's Motion here.

a.    *These Cases Were Filed In Objective Good Faith To Achieve The
Valid Bankruptcy Purpose Of An Orderly, Ratable Liquidation*

57.    The Debtors are investment management funds and their advisors, whose primary

remaining business is overseeing the orderly liquidation and distribution of assets in accordance

with law and as expeditiously as practicable.[27]    Debtors filed these Chapter 11 Cases to achieve

these purposes.  The Supreme Court has recognized that Chapter 11 expressly contemplates plans

of liquidation.  *Florida Dep't of Revenue v. Piccadilly Cafeterias Inc.*, 554 U.S. 33, 37 n.2 (2008);

*see* 11 U.S.C. § 1129(a)(11) (liquidation can be proposed in chapter 11 plan); *id.* §§ 1123(a)(5) &

(b)(4) (plan may distribute all of the property of the estate to holders of claims and interests); *see*

*also In re Insilco Techs., Inc.*, 480 F.3d 212, 214 n.1 (3d Cir. 2007) ("[I]t is not uncommon for

debtors to use the Chapter 11 process to liquidate."); *Alsohaibi v. Arcapita Bank B.S.C.(c)* (*In re*

*Arcapita Bank B.S.C.(c)*), No. 12-11076, 2014 WL 46552, at *6 (S.D.N.Y. Jan. 6, 2014) ("[T]he

Code expressly authorizes chapter 11 plans to liquidate all or some of a debtor's assets.").[28]

58.    Moreover, an orderly liquidation of assets in the face of competing creditor and

stakeholder claims, thereby avoiding the "race to the courthouse," is a central purpose of

bankruptcy.  *In re Murray*, 543 B.R. 484, 494–95, n.57 (Bankr. S.D.N.Y. 2016), *aff'd*, 900 F.3d

53 (2d Cir. 2018) (Bankruptcy's original purpose was "to address the needs and concerns of

creditors with competing demands to debtor's limited assets, and with the understandable desire

that the debtor's assets not go to the swiftest, or most aggressive, of them."  Avoiding this "race to

---

[27]    Financial Statements of MatlinPatterson Global Opportunities Partners (Cayman) II L.P. Year Ended December
31, 2020 and Financial Statements of MatlinPatterson Global Opportunities Partners II L.P. Year Ended
December 31, 2020, attached as Exh. C to the VRG Motion at p. 6, Section 1 (Organization), p. 12 ("For the year
ended December 31, 2020, no investments were held by the Partnership") and p. 15, Section 9 (Legal Matters).)

[28]    VRG and VarigLog also recognize that Chapter 11 can be used for purposes of liquidation. VRG Motion ¶ 55,
VarigLog Motion ¶ 31.  While they claim it is inappropriate in these circumstances, neither elaborates or assists
the Court to understand when an orderly liquidation is or is not appropriate under Chapter 11.

the courthouse" can be accomplished in the bankruptcy process through "orderly and centralized liquidation."); 1 COLLIER ON BANKRUPTCY ¶ 1.01[1].

59.    "It is not bad faith to file a chapter 11 petition for the purpose of a more orderly liquidation."  *In re Soundview Elite Ltd.*, 503 B.R. at 580; *see* 6 COLLIER ON BANKRUPTCY ¶ 1112.07.  In *Soundview*, the debtors were six mutual funds organized under Cayman law with a principal place of business in New York.  *Soundview*, 503 B.R. at 575 n.2.  They filed for Chapter 11 after creditors had filed for the appointment of Cayman Islands liquidators but before the Cayman court had entered an order approving the appointment of liquidators.  *Id.* at 583–84. Although the Chapter 11 petitions were filed to take advantage of the automatic stay and liquidate the mutual funds, the court held that the filing was not in bad faith because the purposes of Chapter 11 include an "orderly liquidation" and the debtors, in their business judgment, had determined that they could realize more on their assets by filing for Chapter 11.  *Id.* at 580–81; *see also In re AAGS Holdings, LLC*, 608 B.R. 373, 383–84 (Bankr. S.D.N.Y. 2019) (filing for Chapter 11 to take advantage of specific provisions of the Bankruptcy Code is not a bad faith filing).

60.    Here, Debtors were faced with three lawsuits in different jurisdictions around the globe seeking in the aggregate damages that far exceeded Debtors' assets.  This in-of-itself is good-faith cause for a Chapter 11 filing.  Further, because all three lawsuits are pending in foreign jurisdictions, while Debtors' assets are all in the United States, all of the foreign litigants would need to come before a U.S. court to obtain any recovery, in any event.  To maximize the value of estate assets for legitimate stakeholders, Debtors therefore sought recourse to Chapter 11 to resolve the enforceability under U.S. law of those foreign claims in a single forum, to avoid the dissipation of assets that would otherwise result from piecemeal litigation in foreign courts for years to come,

and to provide for ratable distribution of Debtors' U.S. assets under the Bankruptcy Code, rather than officiate over a worldwide race to competing, foreign courthouses.

61.     Addressing competing claims to limited assets, *Murray*, 543 B.R. at 494–95, and ensuring that distributions flow only to claims that are valid and enforceable against Debtors under applicable U.S. law, serves the important bankruptcy purpose of protecting and equitably treating legitimate creditors and interest holders, rather than merely those who are swiftest, most aggressive, or most vociferous.  *See In re Freeman*, 540 B.R. 129, 145 (Bankr. E.D. Pa. 2015) (expressing Bankruptcy Code policy of "equitable distribution of limited assets to creditors holding valid claims"); Modified Bench Ruling on Request for Confirmation of Eleventh Amended Joint Chapter 11 Plan, *In re Purdue Pharma L.P.*, No. 19-23649 [Docket No. 3786], 2021 WL 4240974, at *1 (Bankr. S.D.N.Y. Sept. 17, 2021) ("Bankruptcy cases present a unique and perhaps the only means to resolve the collective problem presented by an insolvent debtor and a large body of creditors competing for its insufficient assets . . . .").  There can be no genuine dispute that these Chapter 11 Cases were filed for a valid bankruptcy purpose and therefore in objective good faith.

        *b.*      *These Cases Were Filed In Subjective Good Faith To Accelerate The Domestication And Disallowance Of Debtors' Lawsuits, Not To Obtain Improper Litigation Advantage*

62.     VRG and VarigLog contend that Debtors' filed their cases "as a litigation strategy"[29] and for the purpose of frustrating their "ability to litigate and enforce their claims in foreign jurisdictions."[30]  VRG cites to a number of cases that it says supports the notion that the Chapter 11 Cases have been filed in bad faith because they "are, in essence, a litigation dispute

---

[29]   VarigLog Motion ¶ 35.

[30]   VRG Motion ¶¶ 50, 52.

with three creditors."[31]  But all of VRG's cited cases involve three key, distinguishing factors that do not exist here:

    a.  A binary dispute between the debtor and one creditor, typically over a single asset, the disposition of which was pending before an alternative forum;

    b.  An alternative forum that was therefore available to provide full and complete relief in the debtor-creditor dispute, either through foreclosure, enforcement of a judgment, or continued proceedings; and

    c.  A debtor seeking an identifiable litigation advantage by shifting an existing litigation into bankruptcy court where there was no genuine need for bankruptcy protection and the only purpose of the filing was to evade the alternative forum.

*See, e.g.,  In re C-TC 9th Ave. P'ship*, 113 F.3d 1304 (2d Cir. 1997); *In re Ancona*, No. 14-10532, 2016 WL 7868696 (Bankr. S.D.N.Y. Nov. 30, 2016); *In re HBA East Inc.*, 87 B.R. 248 (Bankr. S.D.N.Y. 1988); *In re Antelope Techs., Inc.*, 431 F. App'x 272 (5th Cir. 2011); *In re Silberkraus*, 253 B.R. 890 (Bankr. C.D. Cal. 2000); *In re Neilson*, No. 17-10631, 2018 WL 6982228 (Bankr. N.D.N.Y. Aug. 31, 2018); *Investors Gr'p, LLC v. Pottorff*, 518 B.R. 380 (N.D. Tex. 2014).

    63.    Not one of these factors is present in Debtors' Chapter 11 Cases. *First*, there are multiple litigation claims and the litigation creditors are not only adverse to Debtors but are in competition with each other over a limited pool of assets which would not be sufficient to satisfy all the claims were they to be allowed in the full amounts claimed. *Murray*, 543 B.R. at 495 (managing claims to limited assets is bankruptcy purpose); *In re MSR Hotels and Resorts, Inc.*, 2013 WL 5716897, Oct. 1, 2013 Hr'g Tr. (Bankr. S.D.N.Y. Oct. 1, 2013) (chapter 11 is appropriate when various parties had "a long history of protracted and contentious litigation", and it was apparent that the debtor's bankruptcy was necessary to allow the debtor the "opportunity to implement a sale of its assets free of such litigation").

---

[31]    VRG Motion ¶¶ 44 onwards.

64.     *Second*, only a U.S. bankruptcy court can provide a single, central forum for the orderly and ratable distribution of Debtors' asset among creditors and other stakeholders who may be entitled to distributions.   None of the other fora in which the foreign litigations have been pending can adjudicate the enforceability of any resulting judgments against Debtors' assets in the United States, nor do so equitably for the benefit of all of Debtors' stakeholders.

65.     *Third*, as explained above, there is no pending litigation abroad that addresses whether VRG can enforce a final Cayman judgment recognizing its Brazilian Arbitral Award within the territorial jurisdiction of the Cayman Islands against Debtors' assets located in the United States.  This is a question of U.S. law, and a matter of *res judicata* when the Second Circuit has already determined that the same Brazilian Arbitral Award is *not* enforceable in the United States.

66.     *Fourth,* these Chapter 11 Cases serve to avoid years of further litigation abroad, with all of the associated drain on the value of Debtors' estates, to bring forward the ultimate questions of U.S. law that would arise anyway, as to whether any ultimate final judgment obtained abroad is enforceable against Debtors' U.S. assets.  This serves to avoid costs, achieve judicial economy, and distribute Debtors' assets to their legitimate stakeholders more quickly.  Because the question of U.S.-law enforceability arises in any event, there is no "litigation advantage" associated with Debtors' Chapter 11 filings.

67.     The indicia of subjective bad faith set forth in *In re C-TC 9th Ave* further demonstrate the absence of any subjective bad faith here.[32]  Debtors have over 100 stakeholders,

---

[32]   The *C-TC* factors are as follows: (1) the debtor has only one asset; (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors; (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt; (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action; (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; (6) the debtor has little or no cash flow; (7) the

including multiple competing litigation creditors whose claims are pending in different foreign courts, at vastly different procedural stages and proceeding at different speeds, and third-party investors who are no less entitled to the protections of the Bankruptcy Code.  *See In re Ancona*, 2016 WL 7868696, at *4 (the second *C-TC* factor boils down to whether there is a "creditor body that is to be protected by the Debtor[s'] filing[s]"); *In re Syndicom Corp.*, 268 B.R. 26, 51 (Bankr. S.D.N.Y. 2001) (same).  Further, Debtors' financial condition is not in essence a two-party dispute with a secured creditor, but rather involves disputes with three, unrelated creditors asserting unrelated, competing claims extending across a multitude of jurisdictions, as well as a secured claim.  Debtors' assets are not subject to any foreclosure action, nor do Movants hold any security over them.  The timing of the filing in July 2021 evidences no intent to frustrate any creditor.  Finally, Debtors have sufficient assets to fund the administrative expenses of the case and plan process.  VRG's reliance on the *C- TC* factors is therefore misplaced.[33]

### 3.    Conversion Pursuant to §1112(b)(4)(A) Is Unwarranted

68.    Movants seek to convert these cases on the basis that there is a continuing or substantial loss to, or diminution of, the estate and the absence of a reasonable likelihood of rehabilitation.  The statute is conjunctive.  Movants must prove both that there is continuing or substantial loss to the estate, and the absence of a reasonable likelihood of rehabilitation.  *In re Adbrite Corp*., 290 B.R at 214.  They have failed to do so.

a.    *There Is No Substantial Or Continuing Loss To Or Diminution Of The Estate*

---

debtor can't meet current expenses including the payment of personal property and real estate taxes; and (8) the debtor has no employees.  *Id.*, 113 F.3d at 1311.

[33]    Even VRG acknowledges it cannot make an adequate showing under the *C-TC* factors.  Motion ¶ 52 (acknowledging the *C-TC* factors are not strictly applicable and must be "modified in the context of these cases").

69.     Movants complain that Debtors are incurring significant professional expenses, despite having no operating business and employees, and that this satisfies the first prong.[34] Ironically, VRG and VarigLog are substantially responsible for those expenses.  VRG has:

a.  Objected to every single one of Debtors' pro forma Second Day Motions designed to facilitate the efficient conduct of these Chapter 11 Cases, including the retention of Debtors' counsel, the CRO, KCC and ordinary course professionals (including those involved with prosecuting Debtors' case against VRG in the Privy Council), necessitating a response from Debtors and a contested hearing [Docket Nos. 69 & 76];

b.  Made plain that it would not agree to a sensible deadline for filing proofs of claim to begin the claims adjudication process, thus requiring Debtors to make a scheduling motion (the Amended Limited Bar Date Motion) [Docket No. 58];

c.  Filed a procedurally unauthorized and highly unusual "letter motion" requesting that the Court strike, rather than consider, the DS Approval Motion from the Court's docket and calendar [Docket No. 140], necessitating a response from Debtors;

d.  Filed an unnecessary Rule 2004 Motion [Docket No. 85], rather than engage with Debtors to obtain documents without the added expense of a contested Rule 2004 process, which ultimately proved to be redundant and was dismissed, but not before Debtors had expended significant resources objecting to it.  After imposing this expense on Debtors VRG then dropped nearly half of its wildly overbroad requests and narrowed the remainder beyond all prior recognition. [Docket No. 113]; and

e.  Now moved to convert these cases to Chapter 7 in an attempt to advantage itself over other stakeholders by depriving Debtors of the history and experience Debtors' current professionals possess and replacing them with an expensive trustee and a whole new set of professionals who are less equipped to oppose VRG's invalid claims.

70.     Likewise VarigLog has:

a.  Also made plain that it would not agree to a sensible deadline for filing proofs of claim to begin the claims adjudication process, thus

---

[34]   VRG Motion ¶ 63; VarigLog Motion ¶¶ 12–13.  VRG and Variglog also rely on professional fees expended prior to the filing of the Chapter 11 Cases.  VRG Motion at 1 n.5; VarigLog Motion ¶ 23.  Those fees are irrelevant to the test under § 1112(b)(4)(A), which only concerns losses to the estate following a Chapter 11 case being commenced. 7 COLLIER ON BANKRUPTCY ¶ 1112.04.

       requiring Debtors to make a scheduling motion to that effect (the Amended Limited Bar Date Motion) [Docket No. 58];

    b.   Joined the VRG Rule 2004 Motion, necessitating further response from Debtors on the Rule 2004 issues;

    c.   Objected to the plain vanilla confidentiality stipulation that Debtors prepared and agreed with VRG, without explaining the basis of its objections until the Court hearing on September 17, 2021, leading to a lengthy and drawn-out process of negotiations over the confidentiality stipulation; and

    d.   Also now moved to convert these cases to Chapter 7, with the same apparent goal as VRG.

71.    As conversion is a drastic measure, courts require more than ordinary course administrative costs to establish "substantial" or "continuing" loss for the purposes of § 1112(b)(4)(A). Instead, courts undertake a "full evaluation of the present condition of the estate." *In re AdBrite* Corp., 290 B.R. at 215. Where, as here, the primary determinant of the value of the estate is defensive litigation, "the Debtors must expend professional fees", and "the mere accrual of professional fees does not constitute a continuing loss to the estate." *In re TMT Procurement Corp.*, 534 B.R. 912, 920 (Bankr. S.D. Tex. 2015).

72.    This is particularly so where those professional fees are directly tied to the movant's own litigious behavior. *In re MSR Hotels and Resorts, Inc.*, No. 13-11512 [Docket No. 157], 2013 WL 5716897, Oct. 1, 2013 Hr'g Tr. In *MSR Hotels*, the movant (a litigation claimant) sought to convert the debtor's case to Chapter 7 because the debtor had no business prospects, conceded that it was going to wind down, and had only "three large creditors and a few de additional *de minimis* creditors" and assets that would be sold outside of a plan. *Id.*, Hr'g Tr. at 42:4–20. After affirming that Chapter 11 plans of liquidation are permissible, the court held that because the case encompassed "a long history of protracted and contentious litigation" among various parties, it was apparent that the debtor's bankruptcy was necessary to allow the debtor the "opportunity to implement a sale of its assets free of such litigation." *Id.*, Hr'g Tr. at 44:1–8. As the Court in that

case observed, "the appointment of a Chapter 7 Trustee" would not "necessarily result in lower cost to the estate, as it would take extensive time and effort for such a Chapter 7 Trustee to familiarize him or herself with the complex facts and arguments in this case" and the litigation claimant that moved for conversion "cannot have it both ways, and cannot pin the blame for the cost of its own litigation tactics on the debtor." *Id.*, Hr'g Tr. at 44:20–24. The same observations hold true here.[35]

73.    Similarly, in *TMT Procurement*, the debtors filed for bankruptcy in June 2013, sold their operational assets in mid-2014, and possessed $16.5 million in cash and certain shares in an unaffiliated company. *Id.*, 534 B.R. at 915–16. The debtors' indirect equity holder filed a motion seeking conversion to Chapter 7 on the basis of § 1112(b)(4)(A), arguing that the estate faced substantial losses and had no prospect of rehabilitation. *Id.* at 917. The court rejected the notion that professional fees constituted a continuing loss to the estate, after "tak[ing] into account the individual circumstances of the debtors", because "the assets [were] relatively stable in value and [were] no longer being diminished through operational losses." *Id.* at 920. Further, the court concluded that "mere accrual of professional fees does not constitute a continuing loss to the estate" because professional fees were necessary to prosecute litigation that would generate a substantial sum for the estate. *Id.* As long as the "only risk of loss looking forward would be the continued accumulation of professionals' fees", continuing to spend money prosecuting the chapter 11 cases was not an instance of "the debtor in possession [] gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation." *Id.* at 922 (citing *Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 516 (8th Cir. 2004)).

---

[35]   In addition to the costs of a Chapter 7 trustee's professionals getting up to speed and then assisting in case administration, a Chapter 7 trustee itself typically receives up to a 3% commission, which in this case could amount to over $4 million. *See* 11 U.S.C. § 326(a).

74.     Likewise, *Gabriel Technologies* involved debtors who had no business operations, employees, customers, products, or operating income. *In re Gabriel Techs. Corp.*, No. 13-30340, 2013 WL 2318581, at *1 (Bankr. N.D. Cal. May 28, 2013).   After losing a lawsuit against Qualcomm with a resulting claim of $12.5 million in attorneys' fees, the *Gabriel Technologies* debtors filed for bankruptcy, staking their plan process on a successful appeal of the Qualcomm judgment. *Id.*   Qualcomm filed a motion seeking conversion of the Chapter 11 cases to Chapter 7, pursuant to § 1112(b)(4)(A). *Id.*   In assessing the motion to convert based on professional fees, the court highlighted that the cases had only been ongoing for three months and the debtors had filed a plan that would be tested in the near term.  For that reason, any continuing losses would end soon, and did not warrant conversion to Chapter 7. *Id.* at *3.

75.     Here, Debtors: (i) are able to pay the ongoing costs of the Chapter 11 Cases and have a significant amount of unencumbered cash with which to do so; (ii) are not incurring actual operating losses and the legal fees being incurred would have to be incurred (and then some) in any event, both outside of bankruptcy and if a Chapter 7 trustee and all new professionals were to take over; and (iii) should be afforded the opportunity to attempt confirmation of their plan and, if successful, wind up and distribute their assets to their legitimate stakeholders, free of the various foreign litigations which they have been defending for many years.[36]  This is particularly so when any other result would (a) allow VRG and VarigLog, who do not yet have allowed claims, to have it both ways and rely on the costs of Debtors defending against their claims (which would also exist outside of bankruptcy, over a lengthier period of time) as justification for conversion; and (b)

---

[36]   Debtors also note that the record in these Chapter 11 Cases does not reflect continuing loss. In fact, Debtors' Monthly Operating Reports for the period ending August 31, 2021 [Docket Nos. 169–175] reflect a net gain in Debtors' cash position. While the Debtors maintain that any loss is in any event irrelevant, it remains important to note that there is no continuing loss regardless.

deprive Debtors of their choice of counsel, who have been involved in these litigations from the

beginning (in VRG's case, for over a decade) and require a Chapter 7 trustee and its professionals

to spend extensive time and effort familiarizing themselves with complex facts and history (as well

as take a commission on any distribution).  *See In re All Am. Of Ashburn, Inc.*, 40 B.R. 104, 109

(Bankr. N.D. Ga. 1984) (denying motion to convert to Chapter 7 where administrative expenses

may be greater because of duplicative work that would be done by new counsel for the chapter 7

trustee); *In re R & S St. Rose Lenders, LLC*, No. 11-14973, 2016 WL 3536533, at *6 (Bankr. D.

Nev. May 18, 2016) (denying motion to convert to Chapter 7 in part due to time and costs involved

in appointing trustee to administer the proceeding).

76.    Unlike the cases discussed above which are directly on point, the key authorities

relied upon by VRG and VarigLog involved vastly different circumstances to the present case.  In

those cases, common scenarios were where the debtor (mostly individuals, in many cases acting

*pro se*) was administratively insolvent, had professed a desire to rehabilitate but had no chance of

any form of rehabilitation from the outside, or had been languishing in Chapter 11 for lengthy

periods with no prospect of confirming a plan.  *See, e.g., In re Adbrite Corp*, 290 B.R. at 215

(converting a chapter 11 case to a chapter 7 case where the Debtor had not prepared a plan of

reorganization, had never earned any revenue, had accepted that its books and records were

unreliable, and had no ability to pay current expenses, noting that "Courts have held that a negative

cash flow postpetition ***and*** an inability to pay current expenses satisfy the elements of §

1112(b)(1)") (emphasis added);  *In re Herb Philipson's Army*, Case No. 18-61376, 2019 WL

11031654, at *6 (Bankr. N.D.N.Y. Dec. 19, 2019) (converting a case to Chapter 7 where debtor

was unable even to pay any of the administrative expenses associated with the wind-down of its

affairs, sought to fund its liquidation entirely through gains made by future, speculative litigation

claims, and debtor's reorganization had proceeded in a haphazard manner, with its plan confirmation and sale process both collapsing); *Loop Corp. v. U.S. Trustee*, 379 F.3d 511 (8th Cir. 2004) (affirming conversion of case involving debtor that had incurred administrative expenses post-petition reflecting approximately 40% of its assets and had been involved in a lengthy confirmation process that had consistently failed to achieve a satisfactory plan); *In re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y. 1988) (converting a case to Chapter 7 where debtor had filed under Chapter 11 before sheriff's sale of residence could be consummated, current obligations on the property were not being met with no reliable source of income to do so, and residual cash available to the estate had "disappeared").

77.    Interpreting § 1112(b)(4)(A) in the strict reading pressed by Movants is precisely what the Eighth Circuit in *Loop* cautioned against: mandating *per se* conversion of a chapter 11 liquidation case.  The Eight Circuit expected that a court will (and should) have discretion to opt neither to convert nor dismiss, despite cause, if the facts and circumstances of the case warrant maintaining the Chapter 11.[37]

> b.    *There Is A Reasonable Likelihood Of Rehabilitation*

78.    Movants further contend that there is no reasonable likelihood of Debtors' rehabilitating because Debtors intend to liquidate and certain of the Debtors have organizational documents that mandate their dissolution.[38]  But VRG and VarigLog both acknowledge that liquidations are permissible under Chapter 11.[39]  In that context, the confirmation of a liquidating

---

[37]    Although *Loop* relied on the statute's permissive language, and under BAPCPA, the statute was subsequently changed to be mandatory rather than permissive (*i.e.*, *shall* convert, rather than *may* convert), courts have reaffirmed the "wide discretion" they possess in determining "cause", even after BAPCPA. *See, e.g.*, *In re Prods. Int'l Co.*, 395 B.R. 101, 109 (Bankr. D. Ariz. 2008) ("Moreover, courts have wide discretion in determining what constitutes such cause."); *In re McKenna*, 580 B.R. 1, 10 (Bankr. D.R.I. 2017) ("The Court has wide discretion in determining cause . . . .").

[38]    VRG Motion ¶ 66; VarigLog Motion ¶ 25.

[39]    VRG Motion ¶ 55; VarigLog Motion ¶ 31.

plan in the face of Debtors otherwise being unable to wind up their affairs due to ongoing litigation is an appropriate avenue of rehabilitation for a dissolving fund.

79.      Where a debtor is engaged in the business of liquidating and distributing their assets to legitimate stakeholders, as the Debtor investment funds are here, the Courts have held that using Chapter 11 to allow the debtor to liquidate efficiently and effectively is sufficient to constitute a "rehabilitation".   *See, e.g., In re MSR Hotels and Resorts, Inc.*, 2013 WL 5716897, Oct. 1, 2013 Hr'g Tr. (Bankr. S.D.N.Y. Oct. 1, 2013) (holding that a debtor proposing a Chapter 11 liquidating plan and which had conceded it was going to wind down could remain in Chapter 11 because debtor should have the opportunity to implement a sale of its assets free of protracted and contentious litigation); *In re R & S St. Rose Lenders, LLC,* 2016 WL 3536533, at *6 n.11 (denying conversion motion and disagreeing that "rehabilitation" excludes liquidating plans); *see also In re The 1031 Tax Group, LLC*, 374 B.R. at 93 (denying conversion where Debtors were operating businesses in wind-down/liquidation mode, and rejecting challenge to rehabilitation due to Debtors working diligently to file a confirmable plan).

80.      This is consistent with the purpose of §1112(b)(4)(A), to "prevent the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation", *In re Lizeric Realty Corp.*, 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995), and the point of rehabilitation:  to "stem the debtor's losses and place the debtor's business enterprise back on solid financial footing within a reasonable amount of time." 7 COLLIER ON BANKRUPTCY ¶ 1112.04.

81.      Here, Debtors, by way of these Chapter 11 Cases and the proposed plan, are seeking to stem the losses from defending meritless litigation claims, in order to get back to their long-overdue final business activities: winding up the funds and making distributions to their limited

38

partners.  Debtors are not taking a gamble at the expense of creditors.  Rather, Debtors have

reasonably concluded that confirming a Chapter 11 plan will return more value to their *bona fide*

stakeholders than spending the next decade enmeshed in contentious litigation in multiple foreign

courts, the results of which are not enforceable against Debtors' U.S. assets.  A successful

confirmation of Debtors' plan turns almost entirely on claims adjudication, which Debtors expect

will be considered in the context of confirmation.  VRG and VarigLog therefore clearly have not

and cannot demonstrate at this stage that there is a reasonable likelihood that Debtors will fail to

rehabilitate.

82.    Finally, a finding that there is no reasonable likelihood of rehabilitation is most

often made in the context of Chapter 11 cases where debtors have been languishing in bankruptcy

for years with no clear path forward.  Often they will have tried and failed to confirm a plan,

sometimes more than once.  *See In re Herb Philipson's Army*, Case No. 18-61376 (DD), 2019 WL

11031654; *Loop Corp. v. U.S. Trustee*, 379 F.3d at 517–19.  In that context, it is understandable

that a court may want to avoid the additional expense of preparing a plan and disclosure statement

and a subsequent solicitation, all the while as the debtor's inability to meet current expenses is

deepening.  These Chapter 11 Cases, however, are months old.  Debtors have already proposed a

confirmable plan and disclosure statement.  It would be extraordinary under the circumstances to

deprive Debtors of the opportunity to prosecute their proposed plan.

c.    *There Are Unusual Circumstances Warranting A Denial Of Conversion*

83.    The presence of "unusual circumstances" also warrants denying conversion.

Pursuant to § 1112(b)(2), the Court may not convert the case if (1) "the court finds and specifically

identifies unusual circumstances establishing that converting or dismissing the case is not in the

best interests of creditors and the estate"; and (2) the debtor or another party in interest establishes that:

    a.  "there is a reasonable likelihood that a plan will be confirmed within [applicable] timeframes"; and

    b.  "the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A) . . . for which there exists a reasonable justification for the act or omission;" and

    c.  the act or omission "will be cured within a reasonable period of time fixed by the court."

84.    The text of the statute is unclear as to whether the "unusual circumstances" exception can be used if cause for conversion/dismissal under § 1112(b)(4)(A) has been established. *In re Alston*, 756 F. App'x 160, 164 n.3 (3d Cir. 2019) (acknowledging conflicting case law but not deciding the matter). Cases decided before the Bankruptcy Technical Corrections Act of 2010 analyzed unusual circumstances even when "cause" was found under § 1112(b)(4)(A). *See In re Orbit Petroleum, Inc.*, 395 B.R. 145, 149 (Bankr. D.N.M. 2008) (finding cause under § 1112(b)(4)(A) and nonetheless proceeding to analysis of unusual circumstances). The Bankruptcy Technical Corrections Act, which incorporated the standalone "unusual circumstances" exception into § 1112(b)(2), was "not intended to enact any substantive change to the Bankruptcy Code." *Pawtucket Credit Union v. Picchi* (*In re Picchi*), 448 B.R. 870, 872 (1st Cir. B.A.P. 2011) (citing 156 Cong. Rec. H7158); *see also* 156 Cong. Rec. S10508 (describing amendments as "purely technical"). Therefore, the better reading of the statute is that the "unusual circumstances" exception applies to all "cause" shown, including under § 1112(b)(4)(A). *See In re Ashley Oaks Dev. Corp.*, 458 B.R. 280, 284 (Bankr. D.S.C. 2011) (holding that "unusual circumstances" exception applies to all "cause" shown).

85.    The statute does not define "unusual circumstances", but courts generally look for "unusual facts or circumstances [that] demonstrate that the purpose of chapter 11 would be better

40

served by maintaining the case as a chapter 11 proceeding." *In re Orbit Petroleum, Inc.*, 395 B.R. at 149–50. In this connection, "a plan [that] has been filed which purports to pay all creditors in full as of the effective date of the plan" is an unusual circumstance sufficient to deny conversion or dismissal even in the face of demonstrated cause. *Id.*, 395 B.R. at 149.

86.     Here there are multiple unusual circumstances. *First*, as described above, maintaining these cases in Chapter 11 (rather than Chapter 7) fulfills the purposes of Chapter 11 of maximizing recovery to legitimate stakeholders, by allowing Debtors and their existing professionals to manage the claims adjudication process concerning longstanding, multiple litigations in which Debtors and their existing professionals have been embroiled for years. *Second*, Debtors have filed a plan that, if confirmed, will pay all allowed creditor claims in full as of the effective date of the plan. Moreover, it is only the ongoing litigations abroad that are preventing an orderly divestiture of Debtors' U.S. assets. VRG and VarigLog should not be able to leverage the existence of their own claims and the legal spend they are necessitating by their actions in these cases to convert them to Chapter 7, in order to effectively hold-up the cases and extract settlement value from Debtors.

87.     *Finally*, proceeding under Chapter 7 would not be any less expensive, and likely more costly, because new professionals would have to learn the complex history, facts and law pertaining to Debtors' litigations (the claims allowance process will be equally necessary in a Chapter 7 proceeding), as well as the history of Debtors and their fund structure. The balance of costs also disfavors conversion because Debtors have already incurred the expense of preparing and proposing a Plan and Disclosure Statement. Much of what remains is the claims adjudication process, which will exist under either Chapter 11 or Chapter 7.

88.    Pursuant to § 1112(b)(2)(A), Debtors already have a Plan and Disclosure Statement

on file.  The hearing to consider the adequacy of Debtors' Disclosure Statement is scheduled for

the same time as the hearing on these Motions.  Debtors will use the opportunity to show they have

proposed a confirmable Plan that is likely to succeed.

## **CONCLUSION**

89.    For all the foregoing reasons, the Motions of VRG and VarigLog should be denied.


Dated: October 22, 2021                **SIMPSON THACHER & BARTLETT LLP**
New York, NY

                                       */s/ Elisha D. Graff*
                                       Elisha D. Graff
                                       Kathrine A. McLendon
                                       David R. Zylberberg
                                       Jamie J. Fell
                                       425 Lexington Avenue
                                       New York, NY 10017
                                       Tel: (212) 455-2000
                                       Fax: (212) 455-2502

                                       -and-

                                       Tyler B. Robinson
                                       Lauren W. Brazier (admitted *pro hac vice*)
                                       CityPoint
                                       One Ropemaker Street
                                       London EC2Y 9HU, England
                                       Tel: +44-(0)20-7275-6500
                                       Fax: +44-(0)20-7275-6592

                                       *Counsel to the Debtors and Debtors-in-Possession*