UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| MatlinPatterson Global Opportunities Partners II L.P., *et al.*, | ) | Case No. 21-11255 (DSJ) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

**BENCH DECISION CONDITIONALLY APPROVING SETTLEMENT
BETWEEN VRG AND DEBTORS (ECF No. 494) AND
DENYING VARIGLOG'S MOTION TO CONVERT (ECF No. 178)[2]**

**DAVID S. JONES
UNITED STATES BANKRUPTCY JUDGE**

The Court rules as follows with respect to (i) Debtors' motion for approval of a proposed

settlement agreement with VRG, docketed at ECF No. 494, and (ii) the motion to convert [ECF

No. 178] filed by the foreign representative of a Brazilian entity referred to as VarigLog.

By way of short preview as to the settlement approval motion, the fact of a settlement

between VRG and the Debtors is an important accomplishment and I am eager to approve some

form of their agreement. However, the settlement as negotiated has certain terms that are unduly

prejudicial to the procedural and substantive rights of VarigLog as a non-settling-party, and those

terms cannot remain in effect if I am to approve the settlement. The settling parties appear to have

signaled their willingness to modify their agreement in ways that will satisfy the concerns I stated

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax
identification number, if any, are: MatlinPatterson Global Opportunities Partners II L.P. (8284); MatlinPatterson
Global Opportunities Partners (Cayman) II L.P. (8246); MatlinPatterson Global Partners II LLC (6962);
MatlinPatterson Global Advisers LLC (2931); MatlinPatterson PE Holdings LLC (6900); Volo Logistics LLC (8287);
MatlinPatterson Global Opportunities Partners (SUB) II L.P. (9209). The location of the Debtors' address is: 300 East
95th Street, Suite 102, New York, New York 10128.

[2] This "bench decision" attempts to serve the interests of efficiency and the need for prompt resolution so that
the bankruptcy case can progress. It is a somewhat expanded written equivalent of an oral bench ruling, and, as
such, it occasionally strikes a more conversational tone and has less-complete record citations than my more
formal written opinions.

at the hearing on the motion. One additional issue that gave me some pause is whether the economic terms of the settlement can fairly be said to fall within the range of reasonable outcomes, given that Debtors and VRG have negotiated a fully-allowed claim amount of VRG's claim, albeit coupled with a cap on distributions establishing that VRG will not in any circumstance be paid more than 70% of its claim amount under a confirmed plan or via a Chapter 7 liquidation. Ultimately, I conclude the agreement's financial terms should be approved under the governing Rule 9019 standard. Therefore, overall, my ruling is that I will approve the motion if modifications described in this bench decision are implemented; without such modifications I will not approve the settlement.

Meanwhile, I deny the VarigLog motion to convert, for reasons this bench decision details after it explains the reasons for my conditional approval of the settlement between Debtors and VRG. VarigLog relied primarily on its contention that either conversion (as VarigLog prefers) or dismissal is required under Bankruptcy Code Section 1112(b) and specifically subsection (b)(4)(A) because the estate both is experiencing substantial or continuing loss or diminution in value, and is devoid of any prospect of "rehabilitation" as that term is used in the statute. In brief, although a number of prior decisions have deemed liquidation not to be a form of "rehabilitation" within the meaning of § 1112(b)(4)(A), I conclude that the Debtors here are pursuing "rehabilitation" of their pre-bankruptcy business, which was a private equity fund engaged in the business of making investments in hopes of generating profits for itself and its limited partner clients, and, in turn, of exiting those investment positions and paying their customers on account of the fund's investment results, and thereafter distributing any remaining cash to investors and winding down and liquidating according to the terms of the fund's governing documents.

I have considered all papers filed in connection with the settlement approval and VarigLog conversion motions, all the pleadings and prior proceedings in the case, and the arguments presented on August 19 during an approximately 4-hour-long hearing on the settlement approval motion and on April 8 during argument on the conversion motion. Familiarity with those matters is assumed and they are not fully summarized in this bench decision, although I will summarize particularly relevant background.

## I.  THE VRG SETTLEMENT MOTION

### BACKGROUND PERTINENT TO SETTLEMENT APPROVAL MOTION

This is an unusual bankruptcy. The case's first day declaration explains roughly as follows. [ECF No. 3]. Debtors comprise a private equity fund whose business consists of accepting funds from investors who become limited partners in an investment vehicle entity. Debtors then would invest those funds with the intention of generating gains and/or profits which then would be monetized and distributed to limited partner investors.

Debtors attracted investors and, consistent with their business plan, made a variety of investments, many in Brazil's aviation sector. These activities led to a variety of complex disputes that have embroiled Debtors and others for at least fifteen years. Debtors undisputedly have more than $100 million in cash, and, but for the demands of three foreign creditors, Debtors would be in position to pay out their remaining funds to investors and continue winding down their affairs. However, Debtors are faced with three substantial claims, all disputed. The first is from an entity called VRG; the second is from the estate from Brazilian insolvency proceedings of a Brazilian entity referred to as VarigLog; and the third is from an entity called HJDK. Debtors have vigorously contested all three claims, which have involved time-consuming, hard-fought, expensive, ongoing, and mostly not yet conclusive litigation in forums including Brazil and the

3

Cayman Islands.  In this bankruptcy, VRG has asserted a claim against Debtors' estate of "at least" $59 million and change; VarigLog asserts a claim of more than $386 million[3]; and HJDK asserts a claim that is material to the estate but that is significantly smaller than those of VRG and VarigLog.  There are no other known non-insider creditors of Debtors, although there is a debtor-related entity, referred to as MP Preferred, that asserts entitlement to repayment on account of certain notes or other debt instruments.

When they commenced this bankruptcy case in 2021, Debtors made clear that their intent was to pursue the disallowance or resolution of the three disputed international creditors' claims without waiting for protracted proceedings abroad to conclude, so that they could make distributions to their limited-partner investors and proceed to wind down their affairs as contemplated in their business plan and organizational documents.  Debtors asserted that without recourse to a U.S. bankruptcy process, they would be trapped in litigation that could easily consume another decade, on disputes that already stretch back roughly fifteen years.  They asserted that the U.S. bankruptcy system was uniquely situated to disallow or quantify the foreign creditors' entitlements as against Debtors, and permit an orderly, cost-effective, and timely resolution of Debtors' affairs.

One of Debtors' main disputes was and is with the entity known as VRG, which had obtained an arbitral award denominated in Brazilian currency against Debtors, but which failed in a long-running effort to have that arbitral award recognized and deemed enforceable in the United States, although Debtors failed to invalidate or escape from that arbitral award in the Brazilian

---

[3] This amount was taken from VarigLog's submitted proof of claim.  As stated in the proof of claim, VarigLog's award is measured in Brazilian Reals; the approximately $387 million claim amount was calculated using the exchange rate as of the petition date.

court system. The value of the arbitral award varies with exchange rates, but was expressed in VRG's proof of claim in this case as approximately $59 million.

Further, as of the petition date, proceedings against VRG were ongoing, including in the Cayman Islands, where VRG was seeking to have the arbitral award recognized. That dispute has progressed through the Cayman Islands courts and up to the highest available appellate court, the Privy Council, which has rejected Debtors' defenses and held that the Brazilian arbitral award is recognizable and enforceable as a matter of Cayman Islands law. Both Debtors and VRG represent that the effect of this holding is the creation, not subject to further review in connection with the Cayman proceedings, of an independently enforceable judgment of a foreign court system that both VRG and Debtors assert would entitle VRG to payment on the arbitral award. They represent that this result will obtain notwithstanding the prior rulings of U.S. courts, including the Second Circuit, that the Brazilian arbitral award could not be recognized as against Debtors as a matter of U.S. law because Debtors had not validly and bindingly consented to arbitration of the claim that was the basis for the award. Thus, both Debtors and VRG represent that the Cayman Islands litigation outcome leaves Debtors with a high degree of litigation risk as to the enforceability in the United States via state-law remedies of the Cayman judgment, notwithstanding U.S. federal courts' previous rejection of attempts to directly enforce the Brazilian arbitral award in the U.S. court system.

Meanwhile, VarigLog is a Brazilian aviation entity that is in Brazilian insolvency proceedings, and alleges that its financial difficulties are attributable in large part to Debtors' misconduct. The estate of VarigLog, by its foreign representative, has asserted a claim for nearly $400 million against Debtors. Roughly speaking, VarigLog's claim is that as a matter of Brazilian law Debtors severely injured VarigLog's business in the course of Debtors' dealings with

VarigLog, thus forcing VarigLog into insolvency proceedings in Brazil. VarigLog's estate is pursuing compensation from Debtors under Brazilian law within or in connection with the Brazilian insolvency proceedings. VarigLog or its estate contend that Debtors are legally responsible and owe the VarigLog estate compensation for harm to the enterprise that Debtors' conduct caused, with that recovery necessary to compensate creditors of the VarigLog estate who otherwise would or might go unpaid or underpaid in the Brazilian insolvency proceeding of VarigLog. Like the VRG dispute, the VarigLog insolvency and VarigLog's pursuit of its claims against Debtors have consumed years and are projected to consume significantly more time.

At the inception of Debtors' bankruptcy case in this Court, both VRG and VarigLog forcefully objected to Debtors' approach to the case, and moved among other things to convert the case to a Chapter 7 liquidation on grounds including that it was a bad-faith filing, a contention emphasized by VRG, and that the estate was experiencing substantial or continuing diminution with no reasonable likelihood of rehabilitation such that either conversion or dismissal pursuant to § 1112(b) and specifically § 1112(b)(4)(A) of the Code was required. Notably, the theories advanced could have supported dismissal as opposed to conversion, but both VRG and VarigLog specified that they sought conversion rather than dismissal, explaining that they favored the order that a Bankruptcy Court process would bring but that they believed for various reasons that a Chapter 7 Trustee run process would be superior to a Chapter 11 process run by Debtors as debtors-in-possession. Among other things, VRG and VarigLog objected that Debtors in this case are represented by the same firm that counseled and represented Debtors before the bankruptcy commenced, and they objected that certain pre-petition financial maneuvers and transactions gave rise to conflicts of Debtors' counsel and demonstrated Debtors' and their counsel's bad faith and lack of trustworthiness at the helm of the estate. Nevertheless, the Court has approved the retention

6

of Debtors' counsel [ECF No. 103], fees likewise have been approved subject to reservations of rights [*see, e.g.*, ECF Nos. 384, 554], and no motion to disqualify counsel has been prosecuted.

On April 8, 2022, the Court heard argument on the VRG's and VarigLog's motions to convert. The Court reserved decision. Soon after the argument, Debtors proposed that the parties be referred to mediation. The Court agreed given the consent of VRG and HJDK, notwithstanding VarigLog's objection and non-consent. The parties subsequently retained a renowned and capable mediator who is a former Bankruptcy Judge of this Court, James Peck. In light of the pending mediation, the Court held its decision on the pending motions to convert in abeyance, to see if the parties could achieve a consensual full or partial resolution of their differences.

The mediation succeeded in part and failed in part. Specifically, assisted by the mediator, VRG and Debtors reached an agreement in principle that is the subject of the Rule 9019 approval motion now before the Court. Further, during the August 19 hearing on that motion, counsel for Debtors and counsel for HJDK reported that they were close to finalizing an agreement as to HJDK's claims, with the broad contours in place and limited remaining issues to be resolved.

VarigLog, however, did not reach agreement with Debtors. VarigLog never consented to mediation but nevertheless was ordered to participate in mediation due to this Court's view that VarigLog's participation could yield a settlement and, even if it did not, could make the mediation more productive. Notwithstanding criticisms by VRG and Debtors of VarigLog's decision not to continue mediating, VarigLog is entirely within its rights not to reach a consensual agreement at this or any time.

Against this backdrop, Debtors have moved for approval of their proposed settlement with VRG, *see* ECF No. 494. The motion is unopposed save by VarigLog, which objects.

7

The settlement agreement between Debtors and VRG is set forth in a term sheet that is annexed to the motion for settlement approval, docketed at ECF No. 494. This bench decision does not restate the entirety of the agreement. Key terms, including the objected-to provisions, are as follows: VRG's claim shall be allowed as an unsecured claim in the amount of $60 million, which slightly exceeds the amount specified in VRG's claim as "at least" the amount due to VRG, but the agreement defines a "Settlement Amount" of $42 million, the payment of which would be deemed in full satisfaction of VRG's claim if other provisions of the settlement are carried out, even if a plan is confirmed that otherwise would allow unsecured creditors to be paid more than 70% of the allowed amounts of their claims. In other words, VRG has committed to accept a maximum payout of roughly 30% less than the claim amount that VRG asserts.

The settlement further provides that Debtors will release VRG, and, upon receipt of the Settlement Amount, VRG will release Debtors of liability. Debtors commit to take steps toward a prompt confirmation of a Chapter 11 plan and VRG agrees to support Debtors' efforts. These steps include that Debtors must take specified steps to advance its litigation with VarigLog; as written, the settlement agreement contemplates an "Outside Date" for plan consummation of February 28, 2023 (an outside date that is allowed so long as Debtors diligently and promptly pursue confirmation), but, during the August 19 hearing, the parties discussed a possible extension of that date. At the hearing, the Court instructed the parties to meet and confer about the Outside Date and certain other scheduling, case management, and sequencing issues, and if no agreement is reached those issues will be resolved at an upcoming hearing currently scheduled for August 30. If a plan is confirmed, as described above, VRG is to receive a cash distribution of $42 million (and no more than $42 million); if such a plan cannot be developed and approved, the Debtors are not to contest the case's dismissal or conversion. The allowed claim amount of VRG (i.e., $60

8

million) is to be binding on any future Chapter 7 Trustee (and any liquidator or equivalent administrator), and the $42 million "Settlement Amount" is to be a cap on the payout that is owed to VRG by such a trustee.  The amount actually paid in a Chapter 7 scenario will be a function of available estate resources and the extent of other claims against the estate.

The agreement does not purport to determine the future treatment of VarigLog's claim or the terms of a plan other than with respect to VRG's claim.  The agreement does not impose non-consensual non-debtor releases on any non-settling party.  The agreement also requires that VRG receive payment at or before such time as the insider creditor MP Preferred receives any payment, but that does not mandate any plan treatment of MP Preferred's entitlements; it merely protects VRG from one potential avenue for the depletion of estate assets before it is paid.  As negotiated, in a provision that the Court already has made clear it cannot except, the agreement also called for this Court to defer for months any decision on VarigLog's pending motion to convert the bankruptcy to Chapter 7, so that Debtors could pursue their preferred course of a Chapter 11 process, now with VRG's support.

In support of the motion, both Debtors and VRG emphasize that the settlement follows many years of extraordinarily expensive and hard-fought litigation by sophisticated parties represented by sophisticated counsel, and, further, that the settlement was facilitated and could only have occurred thanks to the forceful efforts and expert evaluations and recommendations of Judge Peck.  Debtors and VRG further emphasize that the Privy Council's ruling in the Cayman Islands proceedings earlier this year and well after the commencement of the bankruptcy case is a "game-changer" because it gives rise to a judgment or equivalent final order of a foreign court system that will be enforceable in U.S. courts as a matter of New York state law, notwithstanding Debtors' previous successful litigation in this District and the Second Circuit of their contention

that the Brazilian arbitral award was not directly enforceable under U.S. federal law due to the U.S. courts' conclusion applying federal law that Debtors' consent to arbitration was not sufficiently established. Debtors represented that they have assessed all possible defenses and believe their litigation risks are so severe that the settlement they negotiated—essentially a 100% allowance of VRG's asserted claim amount, but with a litigation-risk discount implemented by the settlement's cap on payouts of any distribution so that the claim will not be paid at more than a 70% rate—represents a reasonable litigation risk discount. In response to the Court's stated unwillingness to enter an order requiring that the Court defer a ruling on the VarigLog conversion motion, Debtors and VRG have stated that they would accept a modification or deletion of that term, especially given the Court's nonbinding preview of its anticipated ruling on that motion.

As noted, no party objects to the proposed settlement other than VarigLog. HJDK did not join or oppose the 9019 motion but stated during the August 19 hearing that it supports Debtors' ongoing efforts to resolve claims through a Chapter 11 process, which HJDK reports believing it is close to accomplishing as to its own claim. And MP Preferred supports or at least does not oppose the proposed settlement, to which MP Preferred is not a party; further, the settlement agreement has no bearing on other parties' rights in connection with MP Preferred's claim and entitlements, and specifically in no way limits VarigLog's rights or defenses.

VarigLog, however, objects to the settlement. It raises three broad categories of objections: First, the settlement is impermissibly and unduly prejudicial to VarigLog's own rights as a non-settling creditor, to such an extent that the Court cannot approve the settlement as written. Second, the settlement amount is so high that it does not reflect a reasonable assessment of litigation risks to the estate or the costs versus the benefits of ongoing litigation, and, instead, the settlement represents an improper and excessive payoff to VRG to obtain support for Debtors' hotly contested

10

pursuit of a Chapter 11-based resolution of its affairs.  And third, various pre-petition machinations and transactions create conflicts on the part of Debtors' counsel, such that the Court should not deem this agreement to be the product of genuine, arm's-length negotiation, which is an important factor in the test that courts in this Circuit apply in evaluating Rule 9019 settlement approval motions.

## STANDARD OF REVIEW OF SETTLEMENT APPROVAL MOTION

Before turning to these specific objections, I will state the familiar and well-established legal standard that governs the Court's review of proposed settlements under Bankruptcy Rule 9019, which I am applying in rendering this decision.

"On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).

"Settlements and '[c]ompromises are favored in bankruptcy' as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate." *In re K.G. IM, LLC*, 620 B.R. 469, 483 (Bankr. S.D.N.Y. 2020); *accord* 10 Collier on Bankruptcy ¶ 9019.01 (16th ed. 2019).  The Court, in considering whether to approve a settlement or comprise, should "apprise[] [itself] of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise."  *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) ("***TMT***").

11

Before approving a proposed settlement, the court must determine that it is "fair and equitable" and "in the best interests of the estate." *TMT*, 390 U.S. at 424. When determining whether a proposed settlement or compromise is fair and equitable and in the best interests of the estate, courts in this district consider a series of "interrelated factors" often known as the *Iridium* Factors:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment; (3) the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) the extent to which the settlement is the product of arm's length bargaining.

*In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007) (internal quotation marks omitted); *see also TMT*, 390 U.S. at 424. The settlement need not be the best agreement the debtor could obtain under the circumstances, but rather must fall within the reasonable range of litigation possibilities. *In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y 2005) (citation and internal quotation marks omitted). Accordingly, the court "need not conduct an independent investigation into the reasonableness of the settlement[,]" but rather the court should "canvass the issues" to determine "whether the settlement falls below the lowest point in the range of reasonableness." *Id.* (internal quotation marks omitted). Further, the "decision whether to accept or reject a compromise lies within the sound discretion of the court." *Id.*

In addition to these considerations, the Court must be sensitive to whether the proposed settlement would "unduly prejudice" a non-settling creditor or other party. *See In re Masters Mates & Pilots Pension Plan and IRAP Litigation*, 957 F.2d 1020, 1026 (2d Cir. 1992) ("Where

the rights of third parties are affected, however, their interests too must be considered"); *In re Arter & Hadden LLP*, 373 B.R. 31, 36 (Bankr. N.D. Ohio 2007) ("looking only to the fairness of the settlement as between the debtor and the settling claimant [and ignoring third-party rights] contravenes a basic notion of fairness") (citing and quoting prior cases); *see also In re Medical Asset Management, Inc.*, 249 B.R. 659, 664 (Bankr. W.D. Pa. 2000) ("The fairness to the settling parties of a proposed settlement may not warrant its approval if the rights of others who are not parties to the settlement agreement are unduly prejudiced" and the Court must consider whether any party in interest "has been set apart for unfair treatment.").

## DISCUSSION—SETTLEMENT APPROVAL MOTION

Because both Debtors' motion and many of VarigLog's objections go to various of the *Iridium* factors, this bench decision first identifies and discusses issues raised by VarigLog's objections before summarizing the Court's resulting application of the *Iridium* factors.

### 1.    Asserted Undue Prejudice to Non-Settling Parties

The Court takes seriously the need to ensure that VarigLog is not "unduly prejudiced" by the settlement between VRG and Debtors.  But "undue prejudice" cannot be the same thing as strategic advantage or disadvantage; in this as in many cases, multiple parties are jockeying to maximize their recoveries and best advance their competing interests, and the Court is unaware of case law deeming that dynamic alone to constitute the sort of "undue prejudice" that might preclude approving a proposed settlement.  Rather, the Court assesses whether VarigLog's procedural or substantive rights are unduly impaired by virtue of the proposed settlement.

At argument on August 19, the Court stated its agreement with VarigLog that one settlement provision was flatly inconsistent with VarigLog's procedural entitlements, and also

with the Court's independent authority to make case management decisions, particularly in light of statutory provisions requiring prompt decisions of motions to convert. That provision was the parties' negotiated provision regarding the timing of the Court's resolution of VarigLog's pending motion to convert this case to Chapter 7. The Court would not approve a settlement tying the Court's hands or committing the Court to a specific timetable for deciding VarigLog's motion, particularly given the strict time limits imposed on resolution of such motions by § 1112(b)(3) of the Code.

Debtors and VRG, however, have already expressed willingness to modify that provision, probably assuaged by the Court's explanation on August 19 that it had formed the tentative intention to deny VarigLog's conversion motion. The Court views the deletion of this provision as necessary to eliminate undue prejudice to VarigLog's procedural entitlements, and, in reviewing and approving any proposed order to effectuate the Court's ruling on the 9019 motion, the Court will ensure that this unacceptable provision is eliminated from the settlement. The Court was assured during argument that such a modification would be acceptable to Debtors and to VRG.

VarigLog also objected that other features of the settlement unduly prejudice it—specifically, the settlement's provision that it will bind any subsequent Chapter 7 Trustee, and the settlement's guarantee of a $42 million payout to VRG if Debtors secure confirmation of a plan of reorganization, which VarigLog objects will so deplete estate funds that VarigLog will be prejudiced. Neither objection is well taken. Courts can and do approve settlements binding on later-appointed Chapter 7 Trustees so as to avoid the uncertainty and the potential expense of resumed litigation for the settling parties, and the required $42 million payout to VRG does not apply if the case is later converted to Chapter 7, at which point the $42 million figure would operate as a cap on VRG's recovery. *See, e.g.*, [August 19 Hearing Tr. (ECF No, 549) at 51:10-14 ($42

14

million is payment cap and not guaranteed minimum payment in Chapter 7)]; *Armstrong v. Norwest Bank, Minneapolis, N.A.*, 964 F.2d 797, 801 (8th Cir. 1992) ("it is axiomatic that the Trustee is bound by the acts of the debtor-in-possession" in entering into stipulations and it is "equally self-evident that the Trustee is bound by the decisions of the courts regarding the stipulations, even absent his presence at those proceedings"); *cf. In re Teligent, Inc.*, 326 B.R. 219, 227 (S.D.N.Y. 2005) (citing *Armstrong* with approval and denying the appeal of an estate representative appointed under a Chapter 11 plan's motion to partially vacate a prior court order which granted the debtor-in-possession's motion to assume an insurance contract). And VarigLog's objection may reflect a mistaken belief that the settlement requires a future Chapter 7 Trustee to pay VRG $42 million in cash even if that forced non-pro rata payment on account of any allowed VarigLog claim. It does not, but merely caps any payout to VRG if the case is converted to Chapter 7, even if surplus funds are available. Further, the settlement does not dictate the amount or treatment of VarigLog's claim and it does not call for Court approval of any case-dispositive measure that might affect VarigLog's interests. One specific consequence of these realities is that the settlement does not compel or purport to authorize any non-pari-passu treatment of VarigLog's claim within this bankruptcy case.

### 2.    Remaining Objections and Sufficiency of Movants' Affirmative Showing

VarigLog's remaining objections go to whether the settlement is "fair and equitable" and in the "best interests of the estate," which along with the more detailed *Iridium* factors also are the criteria that the settlement's proponents must establish to secure approval of their settlement under Rule 9019. I therefore turn my focus to the proponents' affirmative arguments in favor of the settlement, and, as appropriate, I then discuss the remaining aspects of VarigLog's objection.

15

A.       **Overall Reasonableness and Best Interests of the Estate**

As Debtors and VRG emphasize, there are many reasons a settlement with VRG will

benefit the estate.  Debtors' dispute with VRG has been intensely fought, expensive, and time

consuming—to the tune of fifteen years of varied litigation spanning multiple continents—and it

shows no sign of ending unless it can be resolved here.  Whether the Court does or does not grant

a motion to convert the case to Chapter 7, no party presently seeks dismissal of the case, and

VRG's claim would need to be resolved in any scenario—necessarily involving expense and delay

if there is no settlement.  If VarigLog were right that significant litigation avenues remain to be

explored, then, whoever is in charge of the case, Debtors will incur significant time and expense—

which they admittedly have not quantified—litigating their dispute with VRG to a full resolution.

Any non-settling creditor likewise will incur substantial expense, experience delay, and face

uncertainty as to when and whether it will be able to collect from Debtors.

Further, Debtors correctly observe that Debtors' efforts to proceed in Chapter 11 have been

forcefully opposed by motivated and seemingly well-funded adversaries including VRG, and

Debtors' attempt to secure affordable and institution-preserving litigation outcomes is reasonably

likely to preserve estate resources by securing "peace" with VRG, even though VarigLog appears

committed to fighting many of the fights that VRG contemplated and commenced during the

bankruptcy case.  The Court further credits the practical explanation advanced by Debtors that,

given the disproportionate size of the VarigLog claim, Debtors will be unable to confirm a plan at

all unless they secure the disallowance or steep reduction of VarigLog's claim through anticipated

litigation in this Court or by future settlement, so that the VRG settlement will benefit the estate

by freeing it to focus on that dispute.  Debtors further represent that their effort to come to terms

with VarigLog is not impossible, and may be aided the potential availability of up to $70 million

16

in liability insurance coverage that might partially pay even a large VarigLog claim if it is allowed. Further, Debtors assert that they will soon intensify litigation challenges to the VarigLog claim.

VarigLog objects in connection with various *Iridium* factors that here one cannot say the estate as a whole will benefit when, in VarigLog's view, the purpose of the settlement is to buy peace from VRG so that the Debtors can better fight the creditor with far and away the largest monetary claim against Debtors, namely, VarigLog. VarigLog is right that the amount of its claim —which its objection to the 9019 motion put at $386 million and which throughout the case has been represented as exceeding $300 million—dwarfs any other claim in the case. VarigLog also is right that the inter-creditor dynamics of this three-creditor case (or four including the Debtors' affiliate MP Preferred) are far from an ordinary Chapter 11 bankruptcy dynamic. Nevertheless, the Court concludes that the settlement *does* benefit the estate as a whole by achieving certainty as to the amount and treatment of the second-largest claim against the estate, which also has been intractable until now, and which has impeded the resolution of Debtors' affairs. Meanwhile, VarigLog's objections that the settlement imposes unfair advantage or distorts the outcome of the case as ransom for buying peace from VRG are misplaced. The settlement does not limit VarigLog's procedural options for advancing its own interests, it does not dictate or mandate the Court's approval of any particular proposed plan, and it does not dictate the treatment of VarigLog's or any other non-settling party's claim, with the narrow exception that it ensures that MP Preferred will not be paid chronologically before VRG.

### B. Reasonableness of Settlement "Price"

The key and for the Court most difficult question becomes whether the settlement price is too high. VarigLog insists that the price is "too rich," and voices withering criticisms that the Debtors have changed their tune from insisting at the case's inception that VRG's claim is worth

zero, to now contending that it is so strong that it should be allowed in its full stated amount, albeit with a payment cap of 70% of the claim amount. VarigLog is correct that this represents a striking about-face, but it is not an unreasoned one given post-petition litigation developments elsewhere. The Court is satisfied that the proposed settlement amount—including the cap on distributions— falls within the "range of reasonable" potential resolutions.

In reaching this determination, as the case law instructs, the Court has "canvassed the issues" and determined that Debtors have formed a reasonable judgment that the Privy Council opinion gives rise to a foreign judgment with a high probability of enforceability in the United States against the estate, as a matter of New York law. This risk exists notwithstanding the Debtors' previous success in U.S. courts preventing efforts to render the Brazilian arbitral award directly enforceable against debtors under the separate federal law that governs enforcement of foreign arbitral awards. Debtors articulated a thoroughly reasoned and plausible view that the res judicata doctrine will not preclude separate enforcement of the newly-final Cayman judgment under the separate applicable state-law regime, notwithstanding the existence of a prior victory as to direct enforcement of the arbitral award. Indeed, Debtors represent that they made this argument in the Cayman Islands, but lost in a unanimous decision of the highest available appellate tribunal, the Privy Council. Further, Debtors at argument forcefully and persuasively contended that they have little chance of prevailing over future actions to enforce the Cayman judgment based on a collateral estoppel defense, notwithstanding VarigLog's contentions to the contrary. [*See* ECF No. 549 (Aug. 19 Hr'g Tr.) 132:9-134:24]. Debtors explain that the controlling issue in previous litigation simply differs from the controlling issue in the Cayman litigation and in any future U.S. litigation to enforce the Cayman judgment, such that there is no prior judicial determination of the

controlling issue to which VRG could be bound.[4]  [*See id*.].  Debtors further emphasize, without detail given the mandates of mediation confidentiality, that the settlement is in keeping with the approach and contours recommended by Judge Peck in his role as mediator, which they argue provides additional reassurance as to the bona fides of the proposed settlement amount.

The Court emphasizes that its duty is not to fully adjudicate the dispositive issues.  Rather, its duty is to carefully canvass the issues and assess whether Debtors' settlement assessment and the negotiated outcome falls within the range of reasonableness.  *See supra* at 11-13.  The Court is satisfied that it does.

One feature of the settlement's financial terms warrants specific discussion.  The settlement awards VRG an allowed claim in the full amount VRG asserts, but caps its recovery at 70%, and Debtors at argument acknowledged that the sole litigation risk discount they obtained is reflected in the payment cap, not in the face amount of the proposed allowed claim.  Neither Debtors nor VRG identified prior orders on Rule 9019 motions in which a negotiated claim discount was effected by a cap on distribution amount, rather than by the reduction of the allowed claim amount.  Other parties identified analogous agreements in, for example, the reorganization support agreement context, but Debtors' negotiated resolution of VRG's claim is unusual in its full

---

[4] VRG's response in support of the settlement helpfully and persuasively provides a detailed analysis regarding how enforcement of the Cayman Islands judgment confirming the arbitral award—which now has been affirmed by the highest available appellate court—enjoys a far greater likelihood of success than VRG's previous attempt to enforce the arbitral award without a court judgment, and the legal underpinnings thereof.  [ECF No. 536 ¶¶ 33-41].  Debtors' papers were relatively reticent about providing a detailed and pessimistic risk assessment, as Rule 9019 movants often are in light of their potential need to continue litigating if the Court does not approve the proposed settlement, but during argument Debtors were full-throated in their insistence that they explored all available arguments, and determined that none had significant chances of success.  [*See* Aug. 19 Hr'g Tr. 132:9-137:11 (Debtors' counsel terming possible collateral estoppel argument a "loser" and denying possible applicability of a res judicata defense)].

allowance of the claim as filed, with the litigation risk discount of at most thirty percent implemented through a payout cap rather than by reducing the claim amount.

Particularly given the unusual dynamics of this three-creditor case, the Court concludes that the negotiated claim resolution, including the full allowance of the VRG claim as asserted, falls within the range of reasonableness and is not incompatible with the best interests of the estate. As noted, Debtors acknowledge that they must drastically reduce or eliminate VarigLog's claim if they are to be able to confirm a plan; otherwise, they will be unable to propose a confirmable plan that will pay VarigLog pro rata with the negotiated payout amount on VRG's claim, and the case must either be converted (with payout to VRG capped at $42 million under the settlement and with pro rata distributions likely based on all creditors' allowed claim amounts), or dismissed. Meanwhile, the third and only other non-insider creditor, HJDK, asserts a substantially smaller claim that may be payable in whole or part out of insurance proceeds, such that HJDK's interests and impact on the case can be accommodated along with the negotiated VRG outcome.  Given these realities, the Court does not agree with VarigLog that the allowed claim amount and capped payment obligation are distortive or contrary to the estate's best interests, and, as discussed above, the Court is satisfied that the negotiated dollar amount falls within the required range of reasonableness when viewed as a matter of litigation-risk-based valuation.

### C.  Whether the Settlement Resulted from Arm's Length Bargaining Given Asserted Conflicts of Counsel

VarigLog objects that Debtors' counsel has conflicts of interest based on its pre-bankruptcy representation of Debtors and other related parties, primarily based on certain transfers of funds among MatlinPatterson related entities, and based on a transaction that securitized certain previously unsecured notes held by MP Preferred, while also modifying the notes' interest rate to attempt to eliminate a potential usury issue.  [ECF No. 538 ¶¶ 40-50].  VarigLog further objects

that these asserted conflicts affect the *Iridium* factor analysis because they render Debtors' counsel incapable of having engaged in genuine, arm's-length negotiation with VRG in reaching the settlement, especially given VRG's prior vociferous objections to those transactions and to counsel's alleged resulting conflicts. VarigLog further observes that this is especially true because the resolution with VRG will cause VRG to no longer advance its conflict allegations and, potentially, demands or litigation claims it conceivably could have aimed directly at counsel, as well as against Debtors.

VarigLog is right that the settlement buys peace between Debtors and VRG, including by resolving VRG's demands that the case be converted based on allegedly bad-faith pre-petition transactions in which Debtors' counsel played a significant role. Debtors and their counsel, however, at all times have denied any misconduct or conflict, and have insisted that their pre-petition transactions had no adverse effect on any party in the bankruptcy because no funds were rendered unavailable to any estate creditor. And as to the settlement, Debtors and VRG insist that, whatever the merits of the asserted conflict issues that VarigLog identifies, the settlement itself is not tainted because (a) the settlement confirms that pre-petition transfers of funds do not cause VRG to be unable to access those funds, and thus resolves the issues giving rise to those objections; and (b) the settlement does not deprive VarigLog or anyone else from pursuing any recourse in light of any perceived conflict.

The Court agrees with Debtors on this last point. The settlement now before the Court results from a reportedly rigorous mediation process, and resolves VRG's hotly contested claim. To the extent VarigLog believes there is a conflict related to the pre-petition securitization of debt held by MP Preferred, neither the propriety of that transaction nor the treatment of MP Preferred's claim is resolved or affected by the settlement, and VarigLog remains free to pursue whatever

recourse it would like.  Meanwhile, as to the other pre-petition transactions or transfers of funds

that VRG and VarigLog have objected to, the settlement appears to resolve or eliminate that

dispute at least as to VRG, which benefits the estate and which, given Debtors' longstanding and

steadfast denial that any pre-petition transfers relocated funds in a way that left them inaccessible

to any creditor, has not been shown to be tainted by a material conflict on the part of Debtors'

counsel.

This conclusion is underscored by the case's procedural history.  Both VRG and VarigLog

have decried pre-petition maneuverings by Debtors through transactions on which Debtors' current

counsel also served as counsel.  But the Court has approved Debtors' retention of their bankruptcy

counsel [ECF No. 103], and the Court recently approved counsel's interim fee applications over

no opposition [ECF No. 554].  Further, no party has sought to disqualify Debtors' counsel.  In

these circumstances, Debtors' counsel is obliged to zealously represent Debtors' and the estate's

interests, and the Court perceives no conflict issue that would render the heated and lengthy process

that yielded the negotiated agreement anything other than arm's-length.

### D.  Position of Non-Settling Parties

VarigLog objects in a three-paragraph section of its opposition [Obj. at 28] that no non-

settling creditor supports the settlement and that, in light of the disproportionate size of VarigLog's

claim and VarigLog's opposition, the Court should conclude that the settlement is contrary to the

interests of the creditor body as a whole, and is not supported by the creditor community.  This

bench decision already discussed the settlement's objective benefits to the estate.  No party in

interest other than VarigLog opposes approval of the settlement, and MP Preferred, while

institutionally related to Debtors, does affirmatively support the settlement.  Meanwhile, HJDK is

unrelated to Debtors, and reports that it is actively pursuing its own settlement with Debtors and their current counsel.

In these circumstances and given the paucity of creditors at all, the Court concludes that the settlement is not objectively contrary to the interests of the creditor body as a whole, but the Court does not place great weight on the support of the known creditors who either do not oppose the settlement (HJDK and MP Preferred) or are a direct party to the settlement (VRG). Rather, because each of the small number of known creditors is (understandably) pursuing and acting based on their respective perceived economic interests, the Court draws no inference from the creditors' respective positions as to whether the settlement should or should not be approved.

### E.  Competency of Counsel

VarigLog "concedes that [Debtors' counsel] is competent and experienced . . . in the discipline relevant here." [Obj. at 29]. VarigLog nevertheless questions whether the Court should give weight to that competence under *Iridium* in light of VarigLog's contentions, previously also raised by VRG, that Debtors' counsel had conflicts and, as a result, was making decisions for reasons other than the disputes' merits. This bench decision already has detailed these assertions, and has noted that the retention and interim fees of Debtors' counsel have been approved while their disqualification is not being pursued. Whatever force VarigLog's conflict-based objections may have, they do not go materially to the VRG settlement's terms, nor is the possible recourse of any party other than VRG eliminated by the settlement. Accordingly, for *Iridium* analysis purposes, the Court finds Debtors' counsel highly competent.

### F. Summary of Application of *Iridium* Factors

For reasons including those detailed just above, the Court concludes as follows regarding the *Iridium* factors:

As to the first and second factors, the settlement and particularly the cap on payment to VRG at 70% of the VRG claim amount falls within the range of reasonable assessments of how appropriately to balance Debtors' possibility of litigation success and the settlement's future benefits. Further, the settlement benefits the estate by increasing the prospect of a viable conclusion of this bankruptcy case at any workable time; meanwhile, the settlement eliminates not just a "likelihood" but rather a certainty of complex and protracted litigation, expense, inconvenience, and delay, as exhibited by the fifteen years that Debtors and VRG have been disputing their respective entitlements. The first two *Iridium* factors therefore weigh in favor of approving the settlement.

The third factor tips moderately in favor of approving the settlement. The Court's independent assessment is that the settlement (stripped of objectionable features that would unduly prejudice VarigLog) advances the "paramount interests of the creditors" by creating a viable pathway for a Chapter 11 resolution of these cases if the VarigLog dispute can be satisfactorily resolved, and by creating the only possible means any party has identified for bringing a timely end to protracted disputes that have paralyzed Debtors and prevented any creditor from actually being paid. VarigLog's opposition has not persuasively shown that the settlement will harm the estate overall, and VarigLog overstates the settlement's impact on it, as the settlement leaves VarigLog able to advance all its entitlements and objections against the estate. Meanwhile, VarigLog's opposition is not joined by any of the few other creditors in this case, thus creating a

mixed picture of creditor opinion that does not point strongly either in favor of or against approving the proposed settlement.

The fourth factor may overlap with the third but focuses on the extent to which other parties in interest support the settlement. Here, this factor does not point in favor of or against approving the settlement, because the limited creditor body has mixed views and no non-creditor party in interest other than Debtors has stated a view.

The fifth factor–the competency and experience of counsel supporting the settlement–strongly favors it. Debtors and VRG are represented by highly experienced and expert bankruptcy litigation counsel, and other similarly experienced and capable counsel either expressly or tacitly support it, while none other than VarigLog opposes. The Court declines to characterize its own experience and knowledge beyond stating that it is adequately informed and experienced to evaluate the parties' contentions and the settlement.

The sixth factor–the nature and breadth of releases to be obtained by officers and directors–has not given rise to any objection, and favors approval given that the releases are limited to mutual releases between Debtors and associated individuals and entities, on the one hand, and VRG and associated individuals and entities, on the other, and given that the releases are tied to the scope of those parties' bilateral dispute.

Finally, the seventh factor strongly supports the settlement. VRG and Debtors have been fiercely opposed adversaries for fifteen years, and agree that their settlement could not have been reached but for Judge Peck's expert assistance as mediator. There is no indication that either side "rolled over" for the other, or that anything other than a hard-fought, good-faith, arm's-length negotiation transpired and led to the proposed settlement before the Court.

Thus, the balance of the *Iridium* factors supports approving the settlement. The settlement reasonably balances the potential benefits and disadvantages to the estate of continued litigation with VRG, considering both the reasonably likely litigation outcome if the estate continues to fight its battle with VRG, and the cost and time savings of settling now. It advances the paramount interests of creditors in a timely resolution of all parties' entitlements, in the only way that foreseeably could yield actual resolutions and payments to all creditors at any remotely soon time. There is no creditor or party-in-interest opposition to the settlement other than from VarigLog, but the Court does not find any influential creditor consensus in favor of approving the settlement in light of VarigLog's disproportionately large claim amount, the small number of creditors, and the absence of an official committee of unsecured creditors in this case. The settlement was negotiated and is supported by highly qualified counsel for both Debtors and VRG, and at least tacitly supported by other capable counsel. The releases to be offered are appropriate and typical of bilateral claim settlements, and have not been objected to. And the settlement is the product of arm's length bargaining.

For these reasons, the Court approves the proposed settlement, subject to the required modifications this bench decision describes.

## II.  VARIGLOG'S MOTION TO CONVERT

Turning to VarigLog's motion to convert, this bench decision relies on the overall background discussion set forth earlier in this opinion, and supplements it with additional background pertinent to the conversion motion.

## ADDITIONAL RELEVANT BACKGROUND

From the bankruptcy case's inception, both VRG and VarigLog have vociferously protested that the case is not a proper use of the U.S. bankruptcy process, and represents an impermissible attempt to thwart foreign court and arbitration proceedings that have been pending elsewhere for years.   Further, they decried pre-petition transactions and restructurings or refinancings conducted by Debtors with advice of their current bankruptcy counsel, which VRG in particular criticized as a nefarious attempt to place assets out of reach of VRG and other unsecured creditors, either by moving them from one related entity to another that may have been less susceptible to collection efforts, or by securitizing previously unsecured debt held by MP Preferred so as to increase the seniority of those obligations as opposed to those asserted by VRG, VarigLog, and HJDK.

Both VRG and VarigLog filed motions to convert the case pursuant to Section 1112(b) of the Bankruptcy Code.  [ECF Nos. 181 (the "**VRG Motion**") and 178 (the "**VarigLog Motion**")]. VarigLog's motion emphasized the argument that dismissal was required for cause pursuant to § 1112(b)(1) by application of § 1112b)(4)(A).  Generally speaking and with certain exceptions not relevant here, § 1112(b)(1) instructs that the bankruptcy court "shall convert" a Chapter 11 case to Chapter 7 or dismiss the case, whichever is in the best interests of creditors and the estate, "for cause."  Section 1112(b)(4) sets forth a nonexhaustive list of circumstances constituting "cause." Section 1112(b)(4)(A) defines one example of "cause" as "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."  *Id.*  VRG raised the same argument, and also argued at length that Debtors' pre-petition conduct (among other things), in which Debtors' counsel played an integral role, constituted bad faith conduct further warranting conversion or dismissal for cause.  [*See* ECF No. 181 ¶¶ 44-59].  Both VRG

and VarigLog sought conversion rather than dismissal, arguing that a continuation of the bankruptcy process would allow for an orderly and in some ways advantageous forum for resolving their entitlements against Debtors, while avoiding what they characterized as the conflict-afflicted or unfair continued participation of Debtors' legal team.  After briefing on the motions was complete, the Court heard argument on April 8, 2022.  [*See* ECF No. 386 (Hr'g. Tr.)].  As noted, almost immediately thereafter, Debtors requested a referral of all parties' disputes to mediation, which the Court approved on the consent of all parties other than VarigLog. [ECF No. 420 (mediation order)].  To facilitate the mediation, the Court approved a series of adjournments of hearings and deferred its ruling on the motion to convert pending the outcome of the mediation.

As the portion of this decision devoted to the VRG settlement reveals, VRG and Debtors arrived at a proposed settlement that, assuming it is finalized and approved, will resolve VRG's current dispute with Debtors and its motion to convert.  The Court has been advised that a settlement with HJDK also may be in the works, with mediated discussions at an advanced stage. This bench decision therefore does not detail or decide VRG's motion, including any contentions it uniquely raised.

The VarigLog Motion argued primarily that "cause" requiring conversion (or dismissal, but VarigLog favored conversion) exists under § 1112(b)(4)(A).  [ECF No. 178 at 7-15].  In brief, VarigLog contended that both requirements of § 1112(b)(4)(A) are present here, because (i) Debtors have no ongoing revenue-generating business and are incurring substantial administrative expenses in the bankruptcy, such that there is "substantial or continuing loss to or diminution of the estate"; and (ii) there is no "reasonable likelihood of rehabilitation" here, because Debtors— as an allegedly non-operating entity seeking only to free itself of litigation and arbitration entanglements so that they can repay their investors—"have no business left to rehabilitate,"

"expressly seek to wind up," and are "mandate[d]" to dissolve by "their organizational documents." [*Id.* at 12].

VarigLog's motion further argued that Debtors' professionals have "conflicts" that preclude their investigating pre-petition transactions including a grant of liens to certain insider creditors, and including a transfer of cash from one related entity to another. [*Id.* at 16]. VarigLog contended that the asserted conflicts may constitute cause warranting conversion or dismissal, with consideration warranted as to whether conversion would cause a non-conflicted trustee and legal team to more effectively protect the estate's interests. [*Id.*].

In opposition to both motions [ECF No. 203], Debtors disputed the existence of any conflicts and disputed the movants' characterizations of their pre-petition conduct, which they insisted was appropriate and did not relocate funds in any way that was intended to or did frustrate their foreign creditors' ability to enforce any successful claims. Debtors further argued that the requirements of § 1112(b)(4)(A) were not met, both because in their view no qualifying diminution of the estate had been shown, and because Debtors were in fact pursuing "rehabilitation" within the meaning of § 1112(b)(4)(A). [*Id.*].

## **DISCUSSION—MOTION TO CONVERT**

VarigLog's motion predicated on Code Section 1112(b)(4)(A) relies on the intuitively seductive idea that you cannot "rehabilitate" a business by liquidating it. VarigLog supports its motion by citing cases holding that attempts to liquidate a business do not constitute "rehabilitation" of that business within the meaning of § 1112(b)(4)(A), such that conversion or dismissal is required if the estate also is experiencing substantial or continuing diminution. [*See* VarigLog Obj. at 12 (citing *In re Gonic Realty Tr.*, 909 F.2d 624, 627 (1st Cir. 1990) ("with no

business left to reorganize, Chapter 11 proceedings were not serving the purpose of rehabilitating the debtor's business"); *In re Taberna Preferred Funding IV, Ltd.*, 594 B.R. 576, 604 (Bankr. S.D.N.Y. 2018) ("It is undisputed that [the debtor] is not an operating business, and there is therefore no rehabilitative objective that can be served by allowing a bankruptcy case to proceed"); *In re Briggs-Cockerham, L.L.C.*, No. 10-34222-BJH-11, 2010 WL 4866874, at *5 (Bankr. N.D. Tex. Nov. 23, 2010) (debtor with no hard assets, operations, employees, or ongoing business lacked reasonable likelihood of rehabilitation); *In re Bay Area Material Handling, Inc.*, 76 F.3d 384 (9th Cir. 1996) (similar); *In re BH S & B Holdings, LLC*, 439 B.R. 342, 347 (Bankr. S.D.N.Y. 2010))].   At the same time, VarigLog acknowledged but attempted to distinguish other cases recognizing that plans of liquidation are not infrequently seen in Chapter 11 cases, and can be appropriate.   [*See* VarigLog Obj. at 13 (citing, *e.g.*, *Florida Dep't of Revenue v. Picadilly Cafeterias, Inc.*, 554 U.S. 33, 37 (2008) (acknowledging without criticism frequent use of Chapter 11 to achieve a sale of "all or substantially all" of a debtor's assets followed by plan of liquidation))].

Notwithstanding the existence of decisions holding that pursuit of a business's liquidation does not constitute "rehabilitation," the Court concludes that here—where the Debtors' business was and is to solicit and obtain investor funds, and then invest the funds, and then liquidate positions, repay those investors, and then wind down the particular fund in question—what Debtors seek to do in this case constitutes "rehabilitation" of their business within the meaning of § 1112(b)(4)(A).   Debtors were formed with a clear business purpose and a plan, including an intended time frame within which they would complete their invest-and-pay-out cycle and thereafter wind down and dissolve.   As a matter of fact based on Debtors' evidentiary showing,

and as a matter of commercial logic, that entire cycle constitutes the essence of Debtors' "business."

This view is reinforced by case law from this Court that VarigLog cites, which observes, "'Rehabilitate' has been defined to mean 'to put back in good condition; re-establish on a firm, sound basis.'" *In re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y. 1988); *see also In re AdBrite Corp.*, 290 B.R. 209, 216 (Bankr. S.D.N.Y. 2003) (rehabilitation "signifies that the debtor will be reestablished on a secured financial basis, which implies establishing a cash flow from which its current obligations can be met"). While *Kanterman* and similar cases go on to say that attempts to liquidate in the circumstances then before the Court did not meet this standard, the cases' reasoning actually supports deeming Debtors' objective here to constitute "rehabilitation," because Debtors are attempting to reestablish themselves on a sound financial basis and to free themselves up to meet their current obligations, and to carry out their longstanding business plan. In other words, Debtors' attempt here to establish, as a matter of United States law, that they will not in any scenario be subject to enforceable claims by their non-U.S. creditors, such that they can proceed as they always intended to pay their investors and complete their planned investment and institutional objectives, constitutes an attempt to use the U.S. bankruptcy process to "rehabilitate" a business that, without U.S. bankruptcy law intervention, will remain unable to carry out its original business plan for an indefinite time.[5]

---

[5] This conclusion makes it unnecessary for the Court to harmonize the possible tension between conversion cases holding that mere liquidation does not constitute rehabilitation with cases that uphold the use of Chapter 11 to sell substantially all estate assets and then confirm a plan of liquidation. The Court notes, however, that an overly rigid application of the § 1112(b)(4)(A) cases invoked by VarigLog could conflict with the widely accepted use of Chapter 11 to sell assets and liquidate the remaining estate.

This analysis is unsettlingly unsupported by directly-on-point case law, and, at argument, Debtors candidly admitted they could identify no prior case adopting such an analysis. But when asked, neither Debtors nor VarigLog nor VRG identified any case law squarely rejecting such an analysis. And here, having reviewed and carefully considered the available evidence including the nature of Debtors' business and their objectives in commencing this bankruptcy case, the Court is persuaded that they are engaged in a rehabilitative effort within the meaning of § 1112(b)(4)(A).

This holding alone does not dispose of VarigLog's motion. First, § 1112(b)(4)(A) calls for dismissal or conversion not just where the debtor is not pursuing an objective that constitutes "rehabilitation," but also where there is an "absence of a reasonable likelihood" of rehabilitation. 11 U.S.C. § 1112(b)(4)(A). Here, however, VarigLog's motion did not depend on a probabilistic assessment of whether Debtors could succeed in their strategy of pursuing claim objections and estimation followed by proposing a plan. Rather, VarigLog's motion asserts that the entire enterprise lacks the hallmarks of rehabilitation. It may yet come to pass that a lack of "reasonable likelihood" of success will be evident. At any such future time, conversion or dismissal may be appropriate, and today's ruling is without prejudice to VarigLog's or any party's ability to so contend in the future.

The Court's holding as to the existence of a "rehabilitative" purpose in this case renders it unnecessary to resolve whether the other prong of § 1112(b)(4)(A)—a "substantial or continuing loss to or diminution of the estate"—is present here. During and for a time after the April 8 argument on the motions to convert, the Court agreed with VarigLog's contention that a "continuing diminution" of the estate was shown based on the significant administrative costs the estate is incurring, coupled with the realities that the estate has no current or anticipated revenue and Debtors did not point to any other way in which their activities might increase the total value

32

of the estate.  Well after the hearing, however, in connection with the VRG settlement and their reported progress toward a negotiated resolution with HJDK, Debtors represented that the estate has made progress toward obtaining insurer agreement—potentially in an amount that could reach as high as $70 million—to pay for some or all liability arising from certain disputes of the estate. It is conceivable to the Court that a debtor's successful effort to secure an insurer commitment to pay creditors could constitute an increase in estate value that could overcome what otherwise would be diminution of the estate.  The issue has not been fully developed, however, and VarigLog has not had an opportunity to conduct discovery or assess whether Debtors in fact are securing added value for the estate in this manner.  The Court's decision therefore does not rely on this prong of § 1112(b)(4)(A) in deciding that that VarigLog has not established "cause" to convert the case to a Chapter 7 liquidation.

One other aspect of the parties' briefing concerning § 1112(b)(4)(A) warrants comment. Debtors' opposition [ECF No. 203] to the conversion motions argued that there are "unusual circumstances" in this case that warrant denying conversion under the asserted authority of § 1112(b)(2) of the Bankruptcy Code, which states that the court may not convert the case if it "finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate," and that the debtor establishes certain criteria including that there is a reasonable likelihood a plan will be confirmed acceptably soon. *See* 11 U.S.C. § 1112(b)(2).  Debtors call it "unclear" whether this exception can be applied where the basis for the "cause" finding is § 1112(b)(4)(A), and Debtors argue that the "better reading" of the statute is to permit § 1112(b)(2) to apply and possibly countermand otherwise-established entitlement to conversion or dismissal based on § 1112(b)(4)(A).  Were the Court satisfied that Debtors could properly resort to § 1112(b)(2) in the face of VarigLog's motion, the Court would

readily conclude that "unusual circumstances" are present here that make conversion or dismissal contrary to the best interests of creditors and the estate.  The motion asks to eject from the case knowledgeable debtor-in-possession management and highly skilled counsel who have invested enormous resources in developing their knowledge and strategy for navigating Debtors' challenging situation.  Converting the case—and no movant seeks dismissal—would put in place a Chapter 7 trustee who, no matter how skilled, would need to learn the case, evaluate and retain professionals, and determine how best to manage the demands of Debtors' sophisticated and litigious creditors.  It would surely take months for a Chapter 7 trustee and his or her professionals to get up to speed and even begin to be able to litigate or negotiate disputes that the incumbent Debtor team has mastered and is seeking to resolve.  Changing horses midstream in this manner would be inefficient, costly, slow, and contrary to the estates' interests in timely and cost-effective resolution.

Despite the obvious practical advantages of retaining Debtors' management and counsel, the Court questions whether recourse to § 1112(b)(2) is available where a movant asserts or establishes the existence of "cause" within the meaning of § 1112(b)(4)(A). The text of § 1112(b)(2) says that the court "may not" convert for cause if the court finds unusual circumstances "**and** the debtor . . . establishes that" two criteria set forth in subsections (A) and (B) of § 1112(b)(2) are met.  11 U.S.C. § 1112(b)(2) (emphasis added).  The first criterion—subsection (A)—concerns the timeliness of a likely plan confirmation, and does not present an impediment here.  But the second—subsection (B)—appears insurmountable by its plain terms, as it says that § 1112(b)(2) can be applied when "the grounds for converting . . . include an act or omission of the debtor other than under paragraph (4)(A)" for which a reasonable justification exists, and that can be cured within a "reasonable time."  *Id.*  As a matter of textual analysis, then, the bar on courts

34

converting or dismissing cases under § 1112(b) based on "unusual circumstances" appears limited

to cases where the "grounds for converting" are "other than under paragraph (4)(A)." This textual

limitation appears to preclude Debtors from relying here on § 1112(b)(2), as numerous other courts

have concluded. *See, e.g.*, *In re 1031 Tax Grp., LLC*, 374 B.R. 78, 93 n. 17 (Bankr. S.D.N.Y.

2007) ("The exception to conversion under § 1112(b)(2) is inapplicable here because the creditors

seek conversion [pursuant to § 1112(b)(4)(A)] based on the loss and diminution of estate assets

and absence of a reasonable likelihood of rehabilitation"); *In re Rubio*, No. 09-75163-AST, 2011

WL 124458, at *3 (Bankr. E.D.N.Y. Jan. 13, 2011) ("the unusual circumstances exception to

dismissal or conversion under § 1112(b)(2) is inapplicable where the movant seeks dismissal or

conversion based on the loss and diminution of estate assets and absence of a reasonable likelihood

of rehabilitation under § 1112(b)(4)(A)"); *In re Herb Philipson's Army*, No. 18-61376 (DD), 2019

WL 11031654, at *5 n.7 (Bankr. N.D.N.Y. Dec. 19, 2019) ("exception to conversion under

§ 1112(b)(2) . . . is inapplicable here because the [movants] seek conversion based on the ground

enumerated in § 1112(b)(4)(A)"). Were it not so, the Court would conclude that § 1112(b)(2)

precludes converting this case.

VarigLog's motion emphasized its contentions under § 1112(b)(4)(A), but it did also raise

contentions—emphasized more heavily by VRG in its motion and at argument—that Debtors

engaged in bad-faith pre-petition conduct that constituted cause to convert the case, so as to allow

VRG and VarigLog to deal with a new fiduciary in the form of a Chapter 7 trustee who may well

have retained new counsel that did not directly advise Debtors on the objected-to pre-petition

transactions. The Court makes no finding on these contentions, and notes several reasons to

question them, including the Court's approval of the retention of and interim fee award to Debtors'

counsel, the absence or non-pursuit of a disqualification motion, and the disavowal of any

wrongdoing by Debtors and their counsel, as well as their representation that their pre-petition transactions or legal measures will not impede creditors' ability to pursue remedies as against Debtors. For purposes of this bench decision, it suffices to say that the proposed VRG settlement changes the calculus on these issues, and may resolve the issue entirely. The VRG settlement reflects VRG's successful effort to ensure that its entitlements will not be defeated by the pre-petition transfer of certain funds from one Debtor entity to a related entity, and the settlement also protects VRG from any risk that may arise if MP Preferred were to be paid earlier than VRG. These agreements may (or may not) result from Debtors having been correct that their pre-petition transactions did not have the nefarious intent or effect that VRG and VarigLog have asserted; they may also suggest debtor willingness to negotiate away any late-created creditor impediment that may exist. The Court therefore does not grant VarigLog relief on bad-faith grounds on the current record, although this determination is without prejudice to a future application on this ground if VarigLog deems it appropriate.

## CONCLUSION

For the reasons stated above, Debtors' motion [ECF No. 494] for an order approving its proposed settlement with VRG is granted subject to the required modifications described above, and VarigLog's motion [ECF No. 178] to convert the bankruptcy case to Chapter 7 is denied, without prejudice to future applications to the extent consistent with this bench decision.

Debtors are to submit an order or orders in keeping with this bench decision.

It is SO ORDERED.

Dated: New York, New York
      August 26, 2022

                                 *s/ David S. Jones*
                                 Honorable David S. Jones
                                 United States Bankruptcy Judge